UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

    -v.-                              :

SALMAAN SIDDIQUI,                 :

        Defendant.               :

- - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: FEB 01 2012

**INFORMATION**

**12 CRIM 089**

## COUNT ONE
### (Conspiracy To Falsify Books and Records and Commit Wire Fraud)

The United States Attorney charges:

### Relevant Persons and Entities

1.    At all times relevant to this Information, Credit Suisse Group ("CS") was a global financial services company headquartered in Zurich, Switzerland.  CS was organized into three divisions: Investment Banking, Private Banking and Asset Management.

2.    At all times relevant to this Information, CS's American Depository Receipts traded on the New York Stock Exchange.

3.    At all times relevant to this Information, CS was required to comply with the federal securities laws, which are designed to ensure that a company's financial information is accurately recorded and accurately disclosed to the public. Specifically, pursuant to the Securities Exchange Act of 1934 and

the rules and regulations promulgated thereunder, CS was required, _inter_ _alia_, to make and keep books, records, and accounts that accurately and fairly reflected CS's business transactions.

4.   At all times relevant to this Information, SALMAAN SIDDIQUI, the defendant, was employed as a trader at CS, where he held the title of Vice President.  SIDDIQUI, at certain times, was responsible for the day-to-day marking of two trading books overseen by a co-conspirator not named as a defendant herein ("CC-1"), including a trading book known as "ABN1."  SIDDIQUI was based in CS's New York, New York office.  SIDDIQUI generally reported to a co-conspirator not named as a defendant herein ("CC-2"), who in turn reported to CC-1.

5.   At all times relevant to this Information, CC-1 held the position of Global Head of the Structured Credit Group in the Securities Department of the Investment Banking Division of CS.  The Structured Credit Group, among other things, warehoused and traded ABS ("Asset Backed Security") cash bonds, which included Residential Mortgage Backed Securities ("RMBS") and Commercial Mortgage Backed Securities ("CMBS").  CC-1 divided his time between the London, United Kingdom and the New York, New York offices of CS.

6.   During the relevant time period, CC-1 oversaw and

2

managed a number of trading books, including a trading book known as "ABN1." The ABN1 book was comprised primarily of several thousand individual long and short subprime-related positions. The long positions, in which a write-down of tens of millions of dollars ultimately occurred, consisted of, among other things, various types of cash securities, including AAA-rated and non-AAA-rated cash bonds. About 500 single name ABS cash bonds, half of which were originated during the second half of 2005 or later, accounted for $3.5 billion of the ABN1 book. Prior to March 2008, ABN1 had a net asset value of approximately $5.35 billion, approximately $3.71 billion of which consisted of ABS cash bonds, including RMBS and CMBS positions.

7.    At all times relevant to this Information, CC-2 was employed as a Managing Director in the Investment Banking Division at CS. CC-2 was based in CS's London, United Kingdom office. At all times relevant to this Information, CC-2 reported directly to CC-1.

8.    At all times relevant to this Information, a co-conspirator not named as a defendant herein ("CC-3") was employed as a trader at CS, where he held the title of Vice President. CC-3, and at certain times SALMAAN SIDDIQUI, the defendant, were responsible for the day-to-day marking of two trading books overseen by CC-1, including the ABN1 book. CC-3 and SIDDQUI were

both based in CS's New York, New York office.  They generally
reported to CC-2.

    9.   At all times relevant to this Information, another
co-conspirator not named as a defendant herein ("CC-4") was a CS
employee responsible for data entry in the ABN1 book, among other
things.  CC-4 was based in CS's London, United Kingdom office.
CC-4 reported to CC-1 and CC-2.

### Background

    10.   CS traders were required at all times to price
securities they held on a "mark-to-market" basis, that is, based
on their fair value, as determined by the current market price of
the asset or liability, or the current market price for similar
assets or liabilities.

    11.   The deterioration throughout 2007 of the real
estate market in the United States, including the subprime
housing market, led to significant reductions in valuations of
mortgage-backed securities.  As mortgage delinquencies increased
across the country, the value of the securities backed by these
mortgages decreased, and the market for them became increasingly
illiquid.

    12.   In the absence of a liquid market, CS traders were
required to look to other indicia in order to determine the fair
value of the assets on their books.  For example, during the

4

relevant time period, the ABX Index, served as a benchmark for certain securities backed by home loans.  It was widely understood within CS that traders were to consult the corresponding ABX indices when pricing RMBS bonds and related products in order to value the assets on their books.

### Overview of The Scheme To Defraud

13.  From at least in or about August 2007, through and including in or about February 2008, SALMAAN SIDDIQUI, the defendant, together with his co-conspirators, manipulated and inflated ABS cash bond position markings in the ABN1 book in order to achieve specific daily and month-end Profit & Loss ("P&L") objectives; in other words, they artificially increased the price of bonds in order to create the false appearance of profitability in that trading book.  SIDDIQUI engaged in this scheme in order to enhance his apparent job performance, knowing that his eligibility for CS bonuses was determined by his superiors.

14.  As a result of the scheme executed by SALMAAN SIDDIQUI, the defendant, and others, there was a growing disparity between the values ascribed to the marks in the ABN1 book and the available external benchmarks, such as the ABX Index.  Indeed, from at least in or about August 2007 through the end of 2007, as ABX Index prices fell, bond prices in the ABN1

trading book that corresponded to the ABX Index remained effectively stable.

15.  During the relevant time period, and in order to effect the fraudulent scheme, CC-1 directed CC-2 to reach specific P&L targets on a daily and month-end basis.  CC-2, in turn, instructed SALMAAN SIDDIQUI, the defendant, CC-3 and CC-4 to mark the books so as to achieve the particular P&L targets specified by CC-1, rather than to reflect the true market value of the bonds.  To accomplish this goal, the team, among other things, marked up bond prices without regard to fair value; improperly offset mark-downs with gains realized in other parts of the book to avoid a P&L impact; and engaged in the practice of "reversing out," which involved freezing marks at a favorable point in time to achieve a desired P&L result.  Indeed, on certain occasions in or about August 2007, as described below, SIDDIQUI sent bond prices to a friend and arranged for the friend to round-trip these marks back to SIDDIQUI, as if they were independent marks, in order to support the high bond marks on CS's books.

16.  As a result of the scheme, SALMAAN SIDDIQUI, the defendant, and his co-conspirators, gave CS senior management the false impression that the ABN1 book was profitable, and caused CS to report false year-end numbers for 2007.  SIDDIQUI knew that

the trading books' profitability, as well as his superiors' evaluation of his performance, largely determined the amount of year-end bonuses for which he might be eligible.  In fact, in the beginning of 2008, SIDDIQUI was informed that he would be paid a significant year-end bonus for 2007.

### SIDDIQUI And His Co-Conspirators Knowingly Mismark Bonds In Order To Achieve P&L Targets And Hide Losses

17.  Beginning in or about the fall of 2007, SALMAAN SIDDIQUI, the defendant, and his co-conspirators, began to manipulate the bond marks in the ABN1 trading book in order to hide their declining value and create the false appearance that the ABN1 book was profitable.  Set forth below are examples of conversations, recorded pursuant to CS's London office policy, in which SIDDIQUI and his co-conspirators discussed, among other things, their P&L objectives, their efforts to reach these P&L goals, and their awareness that bonds in the ABN1 book were significantly mismarked.

18.  During a call on or about October 26, 2007, CC-1 and CC-2 discussed the P&L of each of the books, which CC-2 estimated to be "up 56 [million dollars]."   CC-2 then informed CC-1 that the prices on AAA bonds needed to be marked down.  CC-1 asked "how much" of the $56 million CC-2 wanted to "take ... to reserve against other things?," referring to the practice of

using a particular day's gains to hide losses by waiting until a profitable day in order to perform necessary write-downs.   CC-2 proposed a $15 to $20 million markdown.   CC-1 did not accept CC-2's proposal:   "That's a lot of money, dude."   CC-2 reminded CC-1 that, among other things, "there [were] some AAAs" – i.e., AAA-rated bonds – "that ... need[ed] to be marked down."   CC-1 told CC-2 to "go with 15 [million] for now," and stated that he wanted to "be up 30" – i.e., $30 million in P&L – because he was "trying to get a message across to some people."   In other words, CC-1 wanted to demonstrate to CS senior management that his trading books were profitable.

        19.   By at least late November 2007, CC-1 was aware that the market for mortgage-backed securities had declined enormously.   For example, on or about November 28, 2007, CC-1 told SALMAAN SIDDIQUI, the defendant, CC-2 and CC-3 that "the housing market [was] going down the tubes" and that they had to "find a way to sell these bonds," referring to the mortgage-backed bonds in ABN1.   As CC-1 recognized, "[t]hose bonds are going to start trading worse than the [ABX] Index."   In a later call between SIDDIQUI, CC-2 and CC-3, CC-3 indicated that the market prices for the AAA bonds – which SIDDIQUI and his co-conspirators were marking in the 90s – were in reality "in the low 80s."

## SIDDIQUI And His Co-Conspirators Hide The Mismarks By Deflecting Inquiries From Internal Controls

20.  At all times relevant to this Information, price testing was an independent function from the Investment Banking division of CS ("Price Testing"), which was designed to ensure the accuracy of bond prices.  As part of their scheme, SALMAAN SIDDIQUI, the defendant, and his co-conspirators, concealed their manipulation of bond marks from Price Testing and devised ways to avoid detection of their fraud.

a.  For example, on or about August 29, 2007, and in anticipation of scrutiny of certain month-end marks from Price Testing and senior management, CC-2 instructed SIDDIQUI to obtain third-party marks from other dealers, intending to use these external marks as support when persuading Price Testing to accept CC-2 and his co-conspirators' high marks for approximately 30 RMBS positions in ABN1.  SIDDIQUI thereafter contacted Deutsche Bank and Barclays Capital, only to learn that the banks' marks were substantially lower than the marks SIDDIQUI and his co-conspirators had made in ABN1.  CC-2 informed CC-1 of this development:  "The one bit of bad news at the moment is ... we got two sets of bond marks, two things from Deutsche and Barclay's, and they were not entirely good ... their numbers, they came back with were lower than the bond marks so we've gone

out again to a number of different people to see if they will give us bond marks."

       b.   SIDDIQUI subsequently sought the help of a friend who worked at a small regional investment bank in order to secure "independent" marks.  In less than a minute, SIDDIQUI's friend generated prices on a number of AAA bonds that were nearly identical to those recorded by SIDDIQUI and his co-conspirators in the ABN1 book.  The marks supplied by SIDDIQUI's friend, however, as SIDDIQUI well knew, were a sham.  Nevertheless, at the request of CC-1 for "external month-end marks," SIDDIQUI again obtained sham marks from the same source in or about the beginning of September 2007.

       21.  On another occasion, a Price Testing representative sent an e-mail to SALMAAN SIDDIQUI, the defendant, and CC-2, in which he questioned a bond price: "Curious to know how the desk derived a price of $103.36 for [a particular bond] .... We're looking at a price in the mid 70's range."  In response, SIDDIQUI acknowledged that Price Testing was correct and told the Price Testing representative that "the feed from Bloomberg into [his] price sheet did not pick up the rating downgrade," and, as a result, had caused the higher mark to be recorded by mistake.  The Price Testing representative forwarded SIDDIQUI's e-mail to other members of Price Testing with the

note, "F/Y/I I'm not exactly comfortable with this response.
Makes me wonder how carefully [the front office] is looking at
these prices."

### Late 2007: Risk Management Begins
### To Question The Bond Marks

    22.  In or about late 2007, senior members within CS's
Risk Measurement & Management ("RMM") department began to raise
questions about the valuation of AAA bonds in the ABN1 book.  On
or about November 30, 2007, the head of Market Risk Management
("MRM"), a function within RMM, informed CC-1 via e-mail that the
AAA bonds in the ABN1 book appeared to be priced too high versus
the ABX Index:

> The weighted average AAA paper looks to
> be priced around 90% (see attached
> excel).  The figures seem pretty high to
> me (versus ABX), and wanted to know if I
> was missing something/had taken the wrong
> data.

In response to this inquiry, CC-1 promised to review the data
while downplaying the similarity of his bonds to the ABX:

> Will have someone take a look.  Portfolio
> mix a bit different in that a good
> portion is non LCF and another portion is
> fixed rate underlying loans.

In other words, CC-1 represented that the bonds in ABN1 were not
comparable to the ABX Index because "a good portion" of the ABN1
bonds were "non LCF," that is, they were not Last Cash Flow and

were therefore more valuable.  CC-1 further suggested that ABN1 bonds were of higher value because they consisted of "fixed rate," as opposed to floating rate underlying loans.

      23.  CC-1 later forwarded the e-mail from the head of MRM to CC-2 and asked CC-2 to analyze the AAA ABN1 portfolio so that CC-1 could form a "counter-argument," i.e., so CC-1 could convince MRM that the ABN1 bonds were of higher value than the ABX Index in order to justify the high marks.  CC-2 thereafter asked SALMAAN SIDDIQUI, the defendant, to conduct the requested analysis, which SIDDIQUI did.  The resulting spreadsheet, which SIDDIQUI distributed to CC-1, CC-2 and CC-3 via e-mail on or about December 3, 2007 (the "December 3 Spreadsheet"), did not establish that the bonds in CC-1's trading books were of higher overall quality than the ABX Index.  Instead, the December 3 Spreadsheet showed, among other things, that those bonds in CC-1's trading books that were most comparable to the ABX Index – i.e., the AAA "LCF" ("Last Cash Flow") floating rate bonds -- were valued at weighted average prices above 90, or 15 points higher on average than the corresponding ABX Indices.

      24.  On or about December 4, 2007, SALMAAN SIDDIQUI, the defendant, met with CC-1, CC-2 and CC-3 in the New York, New York offices of CS.  During that meeting, SIDDIQUI and his co-conspirators discussed their AAA bond exposure with reference to

the December 3 Spreadsheet.  Although CC-1 expressly acknowledged
that the AAA bonds were priced too high and that a more accurate
price would be closer to the ABX Index, CC-1 instructed SIDDIQUI,
CC-2, and CC-3 not to make any significant markdowns at that
time.

### 2007 Year-End: The Mismarkings In The ABN1 Book Continue

25.  On or about December 31, 2007, CC-2 instructed
SALMAAN SIDDIQUI, the defendant, regarding year-end marks for AAA
bonds in ABN1.  Specifically, CC-2 noted that the LCF bond marks
for the second half of 2006 and the first half of 2007 in the
ABN1 book were "a bit too high," and asked SIDDIQUI, "Can we push
those down into the 80s?"  CC-2 then directed SIDDIQUI to "figure
out which bonds we can re-mark against them" in order to flatten,
or even out, the P&L impact.

26.  On or about the following day, SALMAAN SIDDIQUI,
the defendant, sent CC-2 an e-mail with a spreadsheet that
included AAA LCF marks for month-end December 2007.  In the e-
mail, SIDDIQUI noted that he re-marked the book by (1) reducing
the weighted average prices of certain vintages of LCF bonds to
below $90; and (2) making as many offsetting marks as possible.
Instead of marking the bonds down to accurate levels, however,
SIDDIQUI marked the weighted average prices at 89.9, an
adjustment "into the 80s" that was designed to avoid detection.

13

Moreover, the "offsetting marks" that SIDDIQUI claimed to have done in ABN1 lacked any correlation to the AAA LCF bonds.

27.   Although the AAA bonds in the ABN1 book were ultimately written down by approximately $35 million in the first half of January 2008, they nevertheless remained grossly overpriced in comparison to the ABX Index.

### The February 2008 Mark-Down

28.   On or about March 20, 2008, CS issued a press release, announcing completion of its internal review and stating that the fair value reduction, or write-down, of the ABS positions – which includes but is not limited to the ABN1 book – was approximately $2.65 billion.

29.   Approximately $540 million of this write-down was attributable to the ABN1 trading book and included ABS cash bonds for the fourth quarter 2007 that the co-conspirators manipulated and inflated in connection with the scheme described herein.

### Statutory Allegation

30.   From at least in or about August 2007, through and including in or about February 2008, in the Southern District of New York and elsewhere, SALMAAN SIDDIQUI, the defendant, together with others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit,

14

(a) falsification of books and records, in violation of Sections 78m(b)(2)(A), 78m(b)(5) and 78ff of Title 15, United States Code, and Title 17, Code of Federal Regulations, Section 240.13b2-1; and (b) wire fraud, in violation of Title 18, United States Code, Section 1343.

## Objects of the Conspiracy

### False Books and Records

31.   It was a part and an object of the conspiracy that SALMAAN SIDDIQUI, the defendant, and others known and unknown, willfully and knowingly, would and did, directly and indirectly, falsify and cause to be falsified books, records, and accounts subject to Section 13(b)(2) of the Securities Exchange Act of 1934, namely books, records, and accounts of Credit Suisse, an issuer with a class of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934, which Credit Suisse was required to make and keep in reasonable detail, accurately and fairly reflecting the transactions and dispositions of the assets of Credit Suisse, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-1.

**Wire Fraud**

32.   It was further a part and an object of the conspiracy that SALMAAN SIDDIQUI, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting to do so, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, all in violation of Title 18, United States Code, Section 1343.

**Means and Methods of the Conspiracy**

33.   Among the means and methods by which SALMAAN SIDDIQUI, the defendant, and his co-conspirators, would and did carry out the conspiracy were the following:

a.   SIDDIQUI and his co-conspirators recorded and caused others to record falsely inflated marks for ABS cash bonds in the ABN1 book.

b.   SIDDIQUI used false "independent" marks, that were obtained through round-trip email exchanges, in order to support certain inflated marks in the ABN1 book.

c.   SIDDIQUI and his co-conspirators thwarted efforts

16

by CS personnel to determine accurate marks of the ABS cash bonds in the ABN1 book by, among other things, providing misleading and incomplete information in response to inquiries.

   d. SIDDIQUI and his co-conspirators used interstate and foreign wires in furtherance of the objects of the conspiracy.

**Overt Acts**

   34. In furtherance of said conspiracy and to effect the illegal objects thereof, SALMAAN SIDDIQUI, the defendant, and his co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

   a. On or about August 29, 2007, SIDDIQUI sent an e-mail from New York, New York to Florida.

   b. On or about September 13, 2007, CC-1, who was in New York, New York, had a telephone conversation with CC-4, who was in London, United Kingdom.

   c. On or about November 28, 2007, CC-2, who was in London, United Kingdom had a telephone conversation with CC-1, who was in New York, New York.

   d. On or about December 1, 2007, CC-1 sent an e-mail to a member of CS's RMM department.

e.    On or about December 3, 2007, SIDDIQUI sent an e-mail to CC-1, CC-2, and CC-3.

f.    On or about December 7, 2007, CC-1 sent an e-mail to CS's Chief Risk Officer in New York, New York.

g.    On or about December 31, 2007, SIDDIQUI had a telephone conversation with CC-2.

(Title 18, United States Code, Section 371.)

### **FORFEITURE ALLEGATION**

35.  As a result of committing the foregoing offense, in violation of Title 18, United States Code, Section 371, SALMAAN SIDDIQUI, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(c)) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense.

(Title 18, United States Code, Section 981(a)(1)©),
and Title 28, United States Code, Section 2461.)

## Substitute Asset Provision

36.   If any of the forfeitable property described in this Information, as a result of any act or omission of the defendant:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third person;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

(Title 18, United States Code, Sections 371, 1343, and 981;
Title 21, United States Code, Section 853(p); and
Title 28, United States Code, Section 2461.)

PREET BHARARA
United States Attorney

19