UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

               Plaintiff,

-vs-

SALMAAN SIDDIQUI,

               Defendant.

No. 12-cr-00089-001 (PAC)

---

## SENTENCING MEMORANDUM ON BEHALF OF
## SALMAAN SIDDIQUI

---

**LOWENSTEIN SANDLER LLP**
Nicole P. De Bello
1251 Avenue of the Americas
New York, New York  10020
212-262-6700
*Attorneys for Defendant*
*Salmaan Siddiqui*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

I.   PRELIMINARY STATEMENT ........................................................8

II.   PROCEDURAL BACKGROUND ................................................10

III.   SALMAAN SIDDIQUI'S PERSONAL HISTORY ...........................12

  A. Salmaan's Early Years................................................................12
  B. Salmaan's Cultural Background and Upbringing .........................14
  C. Salmaan's College Years ............................................................17
  D. Salmaan's Work Experience and Work Ethic ............................20
  E. Salmaan's Religion .....................................................................24
  F. Reconnection with his Father's Family .......................................25
  G. Salmaan's Family.........................................................................26
  H. Collateral Consequences .............................................................30
  I. Salmaan's Remorse.....................................................................32
  J. Salmaan's Community Service Work............................................35
  K. Description of the Offense ...........................................................38

IV.   SALMAAN'S COOPERATION ..................................................42

V.   THE SENTENCING GUIDELINES ............................................44

  A. Loss Calculation..........................................................................44
  B. Minor Role ..................................................................................46
  C. Acceptance of Responsibility ......................................................47

VI.   FORFEITURE ...........................................................................48

VII. A SENTENCE OF TIME SERVED IS WARRANTED UNDER 18 U.S.C. § 3553(A) .50

  A. The Nature and Circumstances of Mr. Siddiqui's Offense....................51
  B. A Substantial Variance is Warranted Because this Crime Reflected
   Aberrational Behavior...........................................................................53
  C. Mr. Siddiqui has Demonstrated Extraordinary Acceptance of
   Responsibility, Extreme Remorse, and Substantial Assistance
   Which Warrants a Substantial Variance ..............................................55
  D. Mr. Siddiqui's Exceptional Charitable and Community Service
   Warrant a Significant Variance.............................................................58
  E. The Serious and Significant Collateral Consequences That Have
   Resulted from Mr. Siddiqui's Guilty Plea Warrant a Meaningful
   Variance ..............................................................................................60

F.     The Need to Avoid Unwarranted Sentencing Disparities......................................60

G.    Mr. Siddiqui's Work Ethic, Education and Strong Character Suggest that He Will Continue to be an Asset to Society.....................................62

H.    The Need for the Sentence Imposed .........................................................................63

VIII.      CONCLUSION..................................................................................................................66

## <u>TABLE OF AUTHORITIES</u>

**Pages**

<small>CASES</small>

*Gall v. U.S.,*
    552 U.S. 38, 128 S. Ct. 586 (2007)........................................................................45

*Kimbrough v. U.S.,*
    552 U.S. 85. 128 S. Ct. 558 (2007)........................................................................46

*Koon v. United States,*
    518 U.S. 81 (1996)..................................................................................................54

*SEC v. Serageldin, et al.*, 12 cv 0796 .......................................................................3

*United States v. Booker,*
    543 U.S. 220 (2005)...........................................................50, 51, 54, 59, 61

*United States v. Broderson,*
    67 F.3d 452 (2d Cir. 1995).....................................................................................47

*United States v. Carson,*
    560 F.3d 566 (6th Cir. 2009) .................................................................................55

*United States v. Caruso,*
    814 F. Supp. 382 (S.D.N.Y. 1993) .......................................................................62

*United States v. Chervin,*
    553 F. App'x 63 (2d Cir. 2014) .............................................................................61

*United States v. Cooper,*
    394 F.3d 172 (3d Cir. 2005)...................................................................................59

*United States v. Cowan*, 2010 WL 694098 (E.D.N.Y. 2010) ...............................64, 65

*United States v. Crosby,*
    397 F.3d 103 (2d Cir. 2005)...................................................................................51

*United States v. Delacruz,*
    371 F. App'x 245 (2d Cir. 2010) ...........................................................................47

*United States v. Dickey,*
    924 F.2d 836 (9th Cir. 1991) *cert. denied,* 502 U.S. 943 (1991)..........................54

*United States v. DiMattina,*
    885 F. Supp. 2d 572 (E.D.N.Y. 2012) ..................................................................59

*United States v. Fagan,*
    162 F.3d 1280 (10th Cir. 1998) ..................................................57

*United States v. Finnigin,*
    2007 WL 4201167 (D.Kan. Nov. 27, 2007) ..................................57

*United States v. Gayle,* 2010 WL 2540488 (E.D.N.Y. 2010) .........................64, 65

*United States v. Gardellini,*
    545 F.3d 1089 (DC Cir. 2008) ...................................................60

*United States v. Genis-Maldonado,* 2010 WL 3125663 (E.D.N.Y. 2010) ........65

*United States v. Goltson,*
    2010 WL 4023299 (E.D.N.Y. 2010) ......................................63, 64

*United States v. Gonzalez,*
    281 F.3d 38 (2d. Cir. 2002) .......................................................54

*United States v. Grant,*
    No. S4-05-CR1192, 2008 WL 4376365 (S.D.N.Y. Sept. 25, 2008) ......48

*United States v. Greene,*
    249 F. Supp. 2d 262 (S.D.N.Y. 2003) .........................................58

*United States v. Hariri,*
    No. 09-CR-02436 (S.D.N.Y. 2011) .............................................52

*United States v. Houchin,*
    2007 WL 3374595 (E.D.Ark. Nov. 6, 2007) ................................55

*United States v. Howe,*
    543 F.3d 128 (3rd Cir. 2008) ....................................................54

*United States v. Hoxie, 10 Cr. 879 (SDNY 2011)* ....................................52

*United States v. Khan,*
    94 F. App'x 33 (2d Cir. 2004) ...................................................54

*United States v. Leyva-Franco,*
    162 F. App'x 751 (9th Cir. 2006) ...............................................55

*United States v. Milne,*
    384 F. Supp. 2d 1309 (E.D.Wis. 2005) ........................................57

*United States v. Molina,*
    963 F. Supp. 213 (E.D.N.Y. 1997) .............................................50

*United States v. Morales*,
    2010 WL 3781017 (E.D.N.Y. 2010)................................................................63

*United States v. Nicolo*,
    597 F.Supp.2d 342 (W.D.N.Y. 2009) ...........................................................48

*United States v. Park*,
    No-13-cr-4142, 2014 WL 3289493 (2d Cir. July 9, 2014) ...........................63

*United States v. Parker*,
    462 F.3d 273 (3d Cir.), cert. denied, --- U.S. ---, 127 S.Ct. 462, 166 L.Ed.2d 329
    (2006) ..............................................................................................................61

*United States v. Paul*,
    239 F. App'x 353 (9th Cir. 2007) .................................................................55

*United States v. Redemann*,
    295 F. Supp. 2d 887 (E.D.Wis. 2003) .........................................................60

*United States v. Ritchey*,
    949 F.2d 61 (2d Cir. 1991)............................................................................54

*United States v. Rothberg*,
    222 F. Supp. 2d 1009 (N.D. Ill. 2002) .........................................................51

*United States v. Samaras*,
    390 F. Supp. 2d 805 (E.D.Wis. 2005)..........................................................60

*United States v. Serafini*,
    233 F.3d 758 (3d Cir. 2000).........................................................................59

*United States v. Swift*,
    2008 WL 2906884 (N.D. Ind. July 28, 2008)..............................................57

*United States v. Thavaraja*,
    740 F.3d 253 (2d Cir. 2014).........................................................................61

*United States v. Thurston*,
    544 F.3d 22 (1st Cir. 2008) ..........................................................................59

*United States v. Wills*,
    476 F.3d 103 (2d Cir. 2007).........................................................................61

*United States v. Woods*,
    159 F.3d 1132 (8th Cir. 1998) ......................................................................59

*US v. Higgs*, 12 cr 088 ......................................................................................10

*US v. Siddiqui*, 12 cr 089 ..................................................................................10

**STATUTES**

18 U.S.C. § 981(a)(1)(C) ...................................................................................48

18 U.S.C. § 981(a)(2)(A) ...................................................................................48

18 U.S.C. § 3553(a) ...........................................................................................10

18 U.S.C. § 3553(a)(2) .......................................................................................63

18 U.S.C. § 3553(a)(2)(A) ..................................................................................64

18 U.S.C. § 3553(a)(2)(A)-(D) ...........................................................................51

18 U.S.C. § 3553(a)(6) ...................................................................................61, 62

18 U.S.C. § 3661 .................................................................................................51

28 U.S.C. § 991 (b)(1)(B) ...................................................................................62

18 USC § 2X1.1 ..................................................................................................44

18 USC § 981(1)(c) and 28 § .............................................................................48

18 USC Section 3553(a) ............................................................................... passim

U.S.S.G. § 3B1.2. ..........................................................................................46, 47

U.S.S.G. § 5K2.20 ..............................................................................................53

U.S.S.G. § 3E1.1 ...........................................................................................56, 58

28 USC § 2461 ...................................................................................................48

USSG § 2B1.1(a)(2) ...........................................................................................44

USSG § 2B1.1(b) ...............................................................................................44

USSG § 2B1.1, comment 3(B) ..........................................................................44

USSG § 3B1.2(a) ................................................................................................47

USSG § 3E.1(a) ..................................................................................................47

USSG §3E1.1(b) .................................................................................................47

**RULES**

Federal Rule of Criminal Procedure 32.2(b).....................................................48

**SECONDARY SOURCES**

Bob Van Voris, *Disney Earnings Leaker Hoxie Sentenced to Home Confinement*, BLOOMBERG
February 22, 2011, 3:01 PM), http://www.bloomberg.com/news/2011-02-22/disney-
earnings-leaker-hoxie-sentenced-to-home-confinement-1-.html......................................55

Michael Hytha, *Galleon Defendant Hariri Prepares for Prison, Hopes for Rebound*,
BLOOMBERG (January 7, 2011, 10:27 AM), http://www.bloomberg.com/news/2011-01-
07/galleon-insider-defendant-hariri-prepares-for-prison-regrets-big-mouth-.html...........55

This sentencing memorandum is respectfully submitted on behalf of Salmaan Tauhid Siddiqui ("Mr. Siddiqui" or "Salmaan"). On February 1, 2012, Mr. Siddiqui pleaded guilty to one count of conspiracy to falsify books and records and wire fraud. He will be sentenced by this Court on July 30, 2014. For the many reasons set forth below, we respectfully submit that a sentence of time served – representing the time during which Mr. Siddiqui was processed through booking at the offices of the Federal Bureau of Investigations prior to his plea of guilty – is a just and appropriate sentence.

## I.      PRELIMINARY STATEMENT

Mr. Siddiqui's offense arises out of his admitted participation in a conspiracy during which he acquiesced to the directives of his superiors, David Higgs ("Higgs") and Kareem Serageldin ("Serageldin"), and agreed to mark certain bonds in a Credit Suisse Group ("CS") trading book known as "ABN1" according to profit and loss ("P&L") directives and not according to their fair market value. He is extraordinarily remorseful for engaging in this violative conduct instead of standing his ground and reporting the wrongdoing to CS compliance or law enforcement.

Specifically, while Mr. Siddiqui's "day job" at CS was that of a bond trader, during a two-week period in August 2007 and a two-week period in December 2007 (the "Relevant Time Period"), when his colleague, Faisal Siddiqui ("Faisal") whose "day job" it was to mark the books was out of town on vacation, Mr. Siddiqui was tasked by Higgs with Faisal's responsibilities as well as his own. The Pre-Sentence Report ("PSR") states that Mr. Siddiqui "[was] responsible for the day-to-day marking of two trading books overseen by Serageldin, including the ABN1 book." PSR at 14, ¶12. Respectfully, this was not at all the case. Mr. Siddiqui's involvement covered a finite period. Indeed, the Information to which Mr. Siddiqui

pled alleges that Mr. Siddiqui was employed by CS as a bond trader at CS and "at certain times was responsible for the day-to-day marking of the ABN1 book." Marking the ABN1 was not his primary job.

While Mr. Siddiqui tried in earnest at first to determine the correct marks for several thousand positions every day, at the same time as executing his daily responsibilities as a bond trader, it became impossible to arrive at an accurate number for certain of the securities given the time pressure he was under and given the expectation of a specific valuation or specific profit or loss by his superiors. For a number bonds that had become relatively illiquid during the Relevant Time Period Salmaan acquiesced to the P&L directives of Higgs, who was Salmaan's direct supervisor, and who was a managing director at CS, and to the directives of Serageldin, who was Higgs's direct supervisor and the Global Head of the Structured Credit Group in the Securities Department of CS's Investment Banking Division. Mr. Siddiqui has come to learn that the efforts by his superiors, Higgs and Serageldin to mark positions in the ABN1 book according to P&L goals went well beyond the discrete episode that he was involved in.

Upon contact from the Securities and Exchange Commission (the "SEC") in early



In addition to wholeheartedly accepting responsibility for his conduct and making amends with his family and with the US government, Mr. Siddiqui has set out on a path to redeem himself through his extraordinary commitment to community service – spending more than 750 hours since his guilty plea volunteering his time with the Offender Aid and Restoration of Arlington County, Inc. ("OAR"), which helps previously incarcerated offenders find gainful employment and productive ways to commit their time after being released from prison. Salmaan has become essentially an "adjunct staff member" of OAR whom "clients fight over for appointments."

In light of these circumstances, together with the factors the Court will evaluate under 18 U.S.C. § 3553(a) and the numerous letters of support attached collectively as Exhibit 1, we, on behalf of Mr. Siddiqui, respectfully contend that a sentence of time served is just, appropriate and consistent with the discretion vested in this Court. A sentence of time served would be sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing, and would recognize the unique and mitigating factors present in Mr. Siddiqui's case.

## II.   PROCEDURAL BACKGROUND

Related cases and sentences:  On February 1, 2012, Serageldin, Higgs, Faisal Siddiqui and Mr. Siddiqui were charged with violations of securities fraud and mismarking of books and records in the matter SEC v. Serageldin, et al., 12 cv 0796 (the "SEC Matter"). On the same day, Mr. Siddiqui and Higgs were each charged by the USAO by way of an information with one count of conspiracy to falsify books and records and commit wire fraud in the separate matters, US v. Siddiqui, 12 cr 089 and US v. Higgs, 12 cr 088. Mr. Siddiqui and Higgs pled guilty to their respective offenses on the day they were charged. Serageldin was also charged on February 1,

2012 with conspiracy to falsify books and records and to commit wire fraud as well as with the substantive counts of falsifying books and records and wire fraud. Serageldin initially pled not guilty to the charges.

On March 5, 2012, Mr. Siddiqui consented to a permanent injunction in the SEC matter and a partial judgment was entered. On January 21, 2014, a final judgment was entered in the SEC Matter against all defendants, no disgorgement was ordered against Mr. Siddiqui and "based on [Mr. Siddiqui's] cooperation in a Commission investigation and related enforcement action" the court did not order a civil penalty. *See* January 21, 2014 Order, attached as <u>Exhibit</u> 2. The same rational was applied to Faisal and Higgs and neither of them was ordered to pay a fine or disgorgement. Seragelin was ordered to disgorge $1,003,368.61 to settle the SEC Matter.

On April 12, 2012, Serageldin pled guilty to one count of conspiracy to falsify books and records and wire fraud. On November 22, 2013, Seragedin was sentenced by Judge Alvin K. Hellerstein to 30 months incarceration, 2 years of supervised release, $100 special assessment, $150,000 fine and forfeiture of $1,003,368.61 (payment of forfeiture also satisfied Serageldin's judgment in the SEC Matter). Serageldin had stipulated to a guidelines range of 57-60 months. *See* Serageldin sentencing transcript, attached as <u>Exhibit</u> 3, at 4.

On June 24, 2014, Higgs was sentenced before Judge Alison J. Nathan to a sentence of time served, (which we understand to be the approximately 4 hours during which Higgs was in custody for booking prior to his guilty plea on February 1, 2014), a fine of $50,000, $100 mandatory special assessment and forfeiture of $900,000. A period of supervised release was not imposed. Judge Nathan started her analysis with a guidelines range of 30-37 months and departed below those guidelines based on facts set forth in 18 USC Section 3553(a) and based upon the USAO's 5K1.1 motion. *See* Higgs transcript attached hereto as <u>Exhibit</u> 4.

The sentences of Higgs and Seragelin provide a strong basis for a sentence of time served for Mr. Siddiqui. Particularly, given that Mr. Siddiqui was the most junior person in the conspiracy, and compared to Higgs and Serageldin had a relatively minor role in the conspiracy, it is logical that Mr. Siddiqui should receive a sentence that is less than that of David Higgs. Moreover, like Higgs, we understand that Mr. Siddiqui will receive a 5K1 letter from the USAO, and unlike Mr. Higgs, has received a letter of support from the SEC as well. Mr. Siddiqui's cooperation makes a sentence of time served even more compelling.

## III.    SALMAAN SIDDIQUI'S PERSONAL HISTORY

### A.    Salmaan's Early Years

Salmaan was born on ████████████ in Sacramento, California. He is the first United States citizen in his family of more than 30 relatives of Pakistani origin living in the United States. He is the younger of two children born to Tauhid Ul-Haq and Nasreen Siddiqui ("Nasreen"). Salmaan's early years began under challenging circumstances. He never knew his father, Tauhid Ul-Haq, who was a Major & Flight Instructor in the Pakistan Army. When Salmaan was approximately two-weeks in utero, Tauhid died in a helicopter crash during a training exercise on the job. His mother, Nasreen was 22 year old at the time and Salmaan's brother, Imran was 1 ½ years old. Nasreen and Tauhid had lived pay-check to pay-check when he was alive, and she faced dim prospects of earning a living after his death as opportunities in Pakistan for an uneducated single mother of two to work to support her family were non-existent. Circumstances for Nasreen and her family escalated from there as severe tension between her and Tauhid's family developed. As she tells it:

> My father in law filed a court case for the custody of my elder son and I was so scared that I would lose him and my unborn child. Harassed by my in laws, ████████████████████████
> ████████████████████████████████████ In order to

> keep my child, I was forced to migrate to the United States in
> March 1975. Now as a single mother, I arrived in Atlanta and
> stayed with my brothers. I was dependent on them and since
> [they] got a job in CA, I too had to move.

Nasreen Siddiqui letter attached as <u>Exhibit</u> 1.

Salmaan was born prematurely, three months after Nasreen's move to Sacramento, CA.
Living conditions for Nasreen and her sons were extremely stressful. Initially, Salmaan and his
mother and brother family lived with Salmaan's four uncles, and for long stretches of time his
grandparents would stay with them – seven to nine people all living in a one bedroom apartment.
Salmaan's wife Faizah delicately explains that ██████████████████████████
███████████████████████████

By the time Salmaan went away to college, the family was in a four bedroom house with
approximately [19] members of the Siddiqui's extended family.

As Salmaan states, "[r]egardless of what I have or may have the fortune to achieve in the
future, it all pales in comparison to my mother's accomplishments and the circumstances under
which she achieved them." Salmaan Siddiqui letter attached as <u>Exhibit</u> 5. Indeed, in order to
provide for her children, Nasreen needed an education and therefore began a GED course when
Salmaan was 3 months old, leaving Salmaan and Imran with a babysitter. After she obtained her
GED, she obtained a civil engineering degree from Sacramento State University. When Nasreen
needed to study, she brought her children with her to the library at night, and once she got a
paying job and needed to work nights, she brought Salmaan and Imran to the office with her.
With the high cost of day-care, Salmaan and his brother spent the majority of their afterschool
time and summers, not at extracurricular activities, but at the work places of family and friends
who could accommodate them. They lived on a very limited budget and Nasreen sewed her own
clothes and clothes for her children. Salmaan was allowed to keep a few toys that he received

for his birthday and holidays and the rest Nasreen saved to give to the children whose birthday

parties Salmaan was invited to, because she could not afford to buy gifts for others.

### B.   Salmaan's Cultural Background and Upbringing

Nasreen and Salmaan's four uncles raised him with core Pakistani/ South Asian values

which included respecting and trusting elders. Salmaan explains that:

> Growing up was certainly challenging.  I was brought up in a very
> religious and conservative family where the essence of our culture
> was to respect, listen and do what your elders told you to do and
> never to challenge authority.  Being raised by 5 distinctly different
> personalities while doing the best to respect my culture was
> challenging, but I always made sure I did whatever I could to learn
> and contribute.    To a great extent, these factors drove the
> development of my non-confrontational personality.

Exhibit 5.

Nasreen explains that while "living in a joint family [Salmaan] had many superiors and elders

and he just did what he was told.  He had the fear of being disciplined if he did not obey."

By all accounts, Salmaan was a well behaved, respectful and kind-hearted child.  Nasreen

writes:

> Salmaan has always been a soft and gentle child.  He never got into
> trouble during elementary, middle or high school.  Several of his
> teachers used to say 'I wish that all the kids in my class were like
> Salmaan.'  He never cheated and was never disrespectful.  He
> always listened to his elders and never talked back, regardless of
> whether he agreed or not.  He just did what he was told.  I made
> sure to instill these values in him from day one.  He never hung out
> with the wrong crowd or did any of the other things that a boy who
> grows up without a father may get involved in.

Exhibit 1.

While Salmaan pleased the adults in his family and his teachers, he struggled to fit in

with his peers.  As Salmaan put it, "Sacramento, CA was not a very diverse demographic while I

was growing up."  Exhibit 5.  In many respects he was ostracized growing up.  He recounts that

> [i]n school, I was the frequent topic of jokes, was bullied and was the least liked amongst my classmates for no other reasons than having a name they couldn't pronounce and looked physically different. As a child, these were difficult things to deal with, but I was taught by my family to always focus on the good in people and be as non-confrontational as possible. It was this belief that allowed me to get through those difficult times and channel my energy towards working hard.

Exhibit 5.

Perhaps as a result of these experiences, Salmaan was and still is a humble person, who does not seek the spotlight or to be recognized for his achievements. Salmaan's childhood friend Zahir Sajad Janmohamed ("Zahir") explains that Salmaan was humble and low-key from a young age:

> We all liked the "show time" of the Lakers – Magic's passes followed by his over-the-top courtside celebrations. Salmaan was never into that. Salmaan was the odd man out – he always cheered for Larry Bird and the Celtics. What was even more bizarre was the decidedly very mature reason he gave us: 'I just like the way Larry Bird shoots and then gets back on defense.' When he played basketball as a teenager, Salmaan never trash talked. He rarely celebrated when he scored a three pointer. He just got back on defense and kept playing. That says a lot about Salmaan.

Salmaan put his heart and soul into school starting at a young age. Nasreen recalls that Salmaan "was in the Spelling Bee and took part in the Science Olympiad and went to the state competition. He would study on his own. I never had to push him to study." Exhibit 1. His uncle Fareed Siddiqui recalls that,

> throughout his entire academic career Salmaan has never had an incident of any kind. In fact, he has never been the kind who believed in taking the easy way out or cutting corners ... I saw him study day and night to get a [nice] score on the SATs, and study night and day to make sure his GPA was the best it could be until his dream of going to an Ivy League University became a reality. Exhibit 1.

Imran Siddiqui, Salmaan's brother distinctively recalls evidence of Salmaan's hard work ethic while Salmaan was studying for the SAT exam in high school and when Imran was in college:

> [Salmaan] called me up to see if I had suggestions for him to help improve his verbal reasoning score. I remember pulling off my shelf two boxes of 2000+ vocabulary flash cards. I told him that if he memorizes all these words he would see significant improvement in his test score. Without hesitating, he proceeded to memorize all of the words. He called me a few weeks later to say he was scoring in the 99[th] percentile. I was proud of his determination and his willingness to apply himself which would ultimately lead him to an acceptance to Dartmouth College.

Indeed, Salmaan understood the value of hard work at a very early age. Throughout his childhood, he contributed towards household expenses and saved for college. He had a newspaper delivery route for which he would wake up every day at 3am. His uncle Javed T. Siddiqui recalls that "before dawn, he would sit in our living room sorting through and organizing the stacks of newspapers that needed to be delivered shortly thereafter. I saw him dedicated to the task – day in and day out, without a grimace on his face and focused on the task at hand." Exhibit 1. He took jobs as a janitor and as a construction worker over the summers. He also helped his mother as much as he could around the house. She recalls that:

> With so many people in the house, he saw all the obligations I now had and would help me with household chores voluntarily; I never had to ask. During the weekends, he would help his uncles with work, wash the cars, help me with the dishwashing, mow the lawn, clean the backyard and babysit his younger cousins. When he got his driver's license at the age of 16, he would help with the grocery

In addition, Salmaan's uncle, Fareed Siddiqui states that

> Although many hardworking people are driven by a desire to succeed for their own sake, Salmaan was always driven to succeed

-16-

> for his mother and his family's sake.  Despite the long hours that
> he [spent] on his academic endeavors, he would always make sure
> to make time to help his mother and other family members around
> the house with whatever they needed.  Whether his aunts needed
> help with dinner or cleaning, or I needed help mowing the lawn, he
> did it all without complaint.  Exhibit 1.

In addition to his responsibilities at school, at work, and around the house, Salmaan fulfilled the role of an older brother and advisor to his younger cousins who lived with him. Mariam Siddiqui states that,

> Salmaan took me to see my first drive-in movie when I was six, he
> won me the biggest stuffed animal from the carnival, comforted
> me when I came home from school crying, and later taught me a
> few Jujitsu self-defense moves so I would be able to protect myself
> if the need ever arise.  As a kid, he was the best older brother a girl
> could ask for.  Exhibit 1.

Salmaan was also a mentor and role model to other Pakistani youths in his community. For example, Syed Anwar Karim states that

> Growing up, my three children always viewed Salmaan as a role
> model.  Often, he provided academic guidance to them.  He was
> consistently willing to counsel them on courses to take and the
> importance of their grades and SATs.  I recall at least one occasion
> on which Salmaan personally reached out to his network of
> contacts to help my daughter, Haina, obtain an internship.

## C.    Salmaan's College Years

Salmaan's hard work and perseverance in school paid off when he was accepted to Dartmouth College after spending one year at community college in Sacramento.  At Dartmouth Salmaan continued his disciplined dedication to his studies, but also found a peer group of his own with whom he could relate and with whom he established life-long bonds. Nakul Krishnaswamy recalls that "when Salmaan transferred into Dartmouth, he immediately gravitated to making friends with a few international students like me who were attracted to his

friendly, warm and personable nature.  Before we knew it, he was well integrated into a group that had an additional year to get to know each other very well."

Salmaan became president of Al-Nur, a Muslim student organization and the vice-president of Milan, a South Asian student organization.  He also served as a regular mentor for freshman international students and organized weekly Friday prayer within the campus chapel. Salmaan's education was financed through scholarships, financial aid, his childhood savings and student-work programs and he also received financial assistance from his grandfather.

Salmaan's generosity and inherent desire to help others had a profound impact on many of his college friends – many of whom he helped to acclimate to life in the United States.  Mr. Krishnaswamy recounts that

> Being international students on financial aid, most of our social circle did not afford a lot of the frills that came with having 'care packages' sent by their parents in the US.  Salmaan immediately sensed this and went with his mother who was dropping him off in college to buy all kinds of 'treats' for his friends who he had just known for a few days by now.  Very quickly his 'what's mine is yours' philosophy became quite evident to me as he would share everything he had with all his friends.  When he realized that some of us had nowhere to go during our Winter or Spring breaks, we always has an open invite from Salmaan to come to spend it with his family in Sacramento.

Another friend, Sadiq A. Malik ("Sadiq") recounts that his first semester at Dartmouth "was by far my worst, both emotionally and academically.  I was terribly homesick and was doing badly in my classes.  If it were not for Salmaan, I would not have been able to get my act together."  Exhibit 1. Sadiq remembers that Salmaan

> proactively reached out to me to ensure that I was smoothly transitioning into American life.  He spent countless hours helping me understand the US college system and guided me through course and professor selections.  I gratefully recall being more comfortable with my new surroundings and improving my grades after I met Salmaan.

Asim Ghaffar ("Asim") recalls that Salmaan was "looked up to by many of the underclassmen" after completing internships at Merrill Lynch and JP Morgan because his "success was achieved without any industry contacts and strictly through his hard work and dedication." *Id.* During Asim's sophomore year, Salmaan "spent countless hours" helping Asim with his resume, preparing for job interviews and instilling in Asim his core values on "work ethic and how to build and maintain personal relationships in a work environment." The examples of Salmaan's generosity and friendship are seemingly endless. And, as he was extending himself to his new friends at college, Salmaan always made time for his family back in Sacramento.

As Salmaan's friend Kashif M. Ali simply explains, "Salmaan was awkward accepting compliments or thanks, or being celebrated. He would contribute – even lead – then step aside. Salmaan helped not out of a sophomoric desire to fit in; he helped because he was generous."

Salmaan's generosity and giving to his friends and family continued beyond college. Zahir explains how Salmaan's giving nature shines through even at the moments he should be allowing others to reciprocate.

> I was in the hospital just days after his daughter was born. He kept saying, 'this is the coolest thing. This is the coolest thing.' Even in the hospital, Salmaan was taking care of us. He kept offering us soda and tea. I told Salmaan to chill, that he just became a father, and that for once, we should take care of him. He still went and got me a Diet Coke.

Salmaan's college friend Asim Ghaffar tells of the critical support he received from Salmaan years after graduating,

> As we progressed in our careers and were well removed from college, we stayed in touch even though Salmaan had relocated to the Tampa, Florida area. At the time, I was going through a very difficult period in my life and decided to make a trip to see Salmaan. Yet, in spite of an unbelievably busy work schedule, Salmaan made me the highest priority in his life during the four

nights that I stayed with him. He spent all of his free time making my stay comfortable: he gave me his car during the day and his bed at night, choosing to sleep on the sofa. Salmaan spent several hours comforting me and helping me understand that things would turn around in my life. Of the hundreds of friends and acquaintances that I made in college and the years after, no one comes close to Salmaan with regard to offering the genuine, caring and unconditional friendship that normally can only come from a parent or sibling.

Bruno Yang writes,

Whenever you need a friend, he was always there for you. There are so many different times when he came through for me … For example; I was going through one of the toughest time of my life during my divorce. I had hit rock bottom. He was one of the few people in the world that was there for me and helped me pull out of it. I didn't ask him to do that. We didn't even live in the same city. But he remembered our friendship and took it upon himself to help me. I will never forget that. You remember the people that come through for you in your darkest hour.

Exhibit 1 contains numerous additional examples of the deep and meaningful impact Salmaan's support has had on his friends and family.

### D.   Salmaan's Work Experience and Work Ethic

As a result of his hard work at Dartmouth College, after graduating Salmaan was hired by JP Morgan & Company in New York. He worked as an analyst in the Asset Backed Securities department of Investment Banking from September 1997 to September 1999, and as an associate in Asset Backed Securities Trading from October 1999 to January 2002.

James R. Pomposelli, Salmaan's former manager at JP Morgan and friend for 17 years states,

I met Salmaan because I had the honor of being his first manager as he began his professional career as an Analyst at JP Morgan. At a time when many youth came to work with a certain sense of entitlement, Salmaan demonstrated a unique work ethic and willingness to do anything he could to help the team.

In Februery of 2002 Salmaan took a job as a Vice President and trader for William R. Hough & Company in Asset Backed Securities Syndication and Trading in St. Petersburg, Florida. He worked there until April 2004.

Loren Carlson, a business associate and friend for 12 years recounted that

> After hiring Salmaan, I was contacted by his former boss, who mentioned to me "please take good care of Salmaan as he is a great young man and will be a star someday." This is something that I had never seen in my professional life, an employee making such an impact on a former boss so that person wanted to remain concerned about his life.

Salmaan is grateful to have received a letter of support from Mr. Carlson who has sadly passed away since writing the letter.

During Salmaan's time at work, he made the same effort to mentor those junior to him as he did at Dartmouth. Bradley Carlson recalls:

> While we worked together at William R. Hough & Co. … Salmaan was directly involved in tutoring me on fixed income instruments and how they worked. He helped to get my career started in fixed income and did this without any prompting or expectation of a reward, despite our relationship as almost total strangers. I believe he saw an area where he could help someone and dove in head first to try and make a difference, which he most definitely did.

Loren Carlson recounts that even when Salmaan was preparing to leave William R. Hough for another opportunity, he acted with "integrity and honesty [that] is unheard of in the securities business."

> One day I received a call from Salmaan and he wanted me to know that he had another opportunity with another firm. What impressed me was that Salmaan said to me 'I have this opportunity, but if you would like me to stay at Hough and help you I will do it. I want to do what is best and please let me know what you would like.'

In May 2004, Mr. Siddiqui moved to Arlington, Virginia to work as a trader in Asset Backed Securities Syndication and Trading for Friedman Billings, Ramsey & Company

-21-

("FBR"). He stayed at FBR until June 2006, at which time he left for a better opportunity in New York, New York with Credit Suisse.

David Foxen, a business associate from FBR for 8 years attests:

> During the 25+ years that I spent in the industry, Salmaan was the most helpful, transparent and hardest working trader that I have ever worked with. He was always available to answer questions and spend extra time after work helping us better understand the products we were working on. Salmaan was also a consummate professional when it came down to dealing with our clients. To ensure they could make the most informative decisions, Salmaan spent a significant amount of time making sure each and every client was armed with all relevant details on any given transaction. Unlike most other traders who closely guard information, Salmaan was always the first to share his knowledge to make sure everyone operated off a "level playing field". All of my clients respected and viewed Salmaan as a very honest and ethical professional. He never played favorites, and treated all of his colleagues and the firm's clients equally.

At Credit Suisse, he was a Vice President in Synthetic CDO Trading from July 2006 through March 2008 when he was terminated from the firm. While due to the circumstances of this case, Mr. Siddiqui does not have letters from his former supervisors at CS, it is rather extraordinary that the executive recruiter who placed Salmaan at CS, Michael P. Maloney, has written a letter of support.  Indeed, while a recruiter would typically want to disassociate from a placement that went on to generate the headlines that this case did, Mr. Maloney explains how he came to know Salmaan

> I met Salmaan in early 2006 when he was referred to me by a number of people in the markets.  The color I got on him was that he was very bright, well-educated, quantitative trader in structured products.  Unlike most traders, he had an even-keeled personality and he was also a confident and aggressive trader.... After we placed him, we were in constant contact with [Salmaan], David Higgs and others at CS who gave us outstanding reviews about him as a person, a professional and regarding his performance.

From April 2008 until January 2012 Mr. Siddiqui worked as a Senior Portfolio Manager for ███████████████████ located in Washington D.C. ███████████ the CEO and Managing Director of ███████ and a business associate of Salmaan's from FBR states:

> I hold Salmaan in the highest regard as to his professionalism, work ethic, integrity, sincerity and charitableness. He always exhibited the best characteristics of an employee, colleague, friend and confidant.

███████████ describes that at ███████ the "working environment we operated in was very close, almost family type environment." To that end, ███████ explains that while at ████████ to support Salmaan in his "faith and spiritual journey," ██████ along with a few other friends have started participating for the past few years, "in the first day of Ramadan fasting." He explains that it "became a tradition to break the fast at an authentic Halal restaurant where many members of the Muslim community would gather. Salmaan made sure we felt welcomed by the community and treated us to amazing feasts." ██████s gesture is a reflection of Salmaan's dedication to others. It is also symbolic of how far Salmaan has come - from being bullied for his race and religion as a child to having the support of his Wall Street colleagues in his Ramadan fast. Salmaan voluntarily resigned from ████████ due to the charges to which he pled guilty.

Salmaan's lifelong friend Zahir Sajad Janmohamed eloquently explains what drove Salmaan to pursue and maintain a career in the financial services industry:

> I remember attending one dinner party where Salmaan sat with a group of college students and gave them advice about entering the world of banking. He told them if you are doing it for the money, you have the wrong field. You have to do it because you love the intellectual challenge... This is Salmaan's motto. Banking has always been a puzzle, a riddle for Salmaan. He loves solving problems; he loves being a part of a team. He loves seeing others – above and below him –succeed.

### E.    Salmaan's Religion

Salmaan is a practicing Muslim and is deeply committed to his faith.  Salmaan's wife

Faizah describes Salmaan's commitment to the Muslim religion,

> Salmaan is a God-fearing, religious Muslim man. He has become
> even more religious and closer to God since our lives were
> shattered and turned upside down from this unfortunate situation.
> He does not drink alcohol nor gamble. He has fasted every year for
> the holy month of Ramadan since he was 12 years old and
> continues to fast every year regardless of being at work or having
> to fast during the humid summers. He never complains.  He attends
> tara'wih prayers (supplemental prayers lasting roughly 1-2 hours
> that are performed by Muslims every night in the Islamic month of
> Ramadan). Outside of Ramadan, he continues to pray five times a
> day-every day and goes to Friday prayers each week and each time
> candidly gives to the homeless people standing outside the mosque
> asking for money. … Salmaan and I were planning to go to Saudi
> Arabia before all of this happened for the mandatory religious
> pilgrimage, known as Hajj. We are currently not able of
> performing this religious obligation because it requires a passport
> and international travel.

Over the years, Salmaan has quietly educated his non-Muslim friends and colleagues

about his religion.  Peter Zimmer, a former colleague writes:

> In keeping with his Muslim faith [Salmaan] gives Zakat (annual
> tax to the poor).  Each year prior to paying his tax he asked if I
> personally knew anyone who was in need of financial assistance
> for food, shelter or medical attention.  I was never able to refer
> anyone to him but I always appreciated the gesture.  He prefers to
> help people directly rather than give to a charity or foundation.

Notably, the month of Ramadan began on June 28 and Salmaan is currently immersed in

his religious observance. Ramadan is considered one of the Five Pillars of Islam, during which

observant Muslims fast until sundown, forgoing food, water and adhering to an increased prayer

schedule.  Ramadan ends at the end of July, shortly before Salmaan is to be sentenced.  Salmaan

describes the significance of the Ramadan fast for him as a way to realize and acknowledge the

basic privileges of food and water that others in the world are not as lucky to enjoy.

In keeping with the Muslim religion and his desire to help those less fortunate, Salmaan donates at least 2.5% of his savings to those in need. As Salmaan explains:

> Throughout my career, my drive to succeed was never based off personal financial incentives, but rather having the opportunity to use that good fortune to contribute back to society and help those in need. Since I started working and through the years, I have been a major contributor to numerous educational and charitable organizations such as Dartmouth College, The Citizen's Foundation, Islamic Relief USA, The Khan Academy, local mosques, Offender Aid and Restoration, Girl & Boy Scouts USA, international literacy programs and general families in need. Away from organizational donations, I have been the primary financial supporter of my unemployed mother for the past several years. Despite my current financial hardships, I have not wavered from commitments like these. As a human being, it is and will always be my responsibility to find a way to help and contribute in any and all possible ways.

## F.    Reconnection with his Father's Family

In addition to the contributions to his family, friends and colleagues and his dedication to his work, in approximately 2002, Salmaan "took upon himself the mammoth and daunting task of bringing" the Siddiqui side of the family together with Salmaan's estranged family from his father's side – from whom his mother had fled in 1975. As his first cousin Danish Zia recounts: "Finding and talking to people whom he never met, about sensitive topic required delicacy and patience. After two years of perseverance, Salmaan was able to thaw the relationship and the healing began … we are all indebted to Salmaan for his massive contribution that he has enriched our lives." Similarly, Khurran Zia, his cousin recounts:

> As a grown-up, Salmaan began to delicately work to reestablish the bonds of kinship with his fathers' side of the family. Through sheer will, determination, wisdom and commitment, Salmaan helped the families come together and heal. Through his efforts, he brought much needed relief and comfort to both sides. To me, he

> gave the gift of a brother I knew I had, but had never met. For this
> I shall be forever grateful to him.[1]

As with his other friends and family, Salmaan worked hard to foster his relatively new family

relationships, by going out of his way to travel for family events despite his busy schedule.

### G.    Salmaan's Family

In June 2004, shortly after Salmaan had relocated from Florida to Arlington, Virginia to

work for FBR, Salmaan's mother Nasreen came to visit him and brought Salmaan to meet a

family friend in the area so that he could know a few friendly faces in town.  Nasreen had

ulterior motives as well.   In keeping with Pakistani tradition, Nasreen sought to introduce

Salmaan to Faizah Khan, the daughter of her friend.  Faizah and Salmaan met that day and

Nasreen's plan worked – the two were a true match.  On August 7, 2005, Salmaan and Faizah

were married in Rockville, Maryland. They now have two young daughters, ███████ (4-years-

old) and ████ (2-years-old).

Salmaan states that "the biggest blessings and brightest points of my life will always be

my marriage to my incredible wife and our two young beautiful daughters.  My love for all three

is not only unconditional, but they embody the very essence of what I will live the rest of my life

for."   Undoubtedly, the pain and remorse that Salmaan feels about his conduct at CS is

exacerbated by the innocence and vulnerability of his young family.  As Salmaan states

> During many moments with my wife and children, I feel
> unimaginable pain and hurt realizing that my actions from 2007
> have unintended future consequences for my daughters and direct
> daily consequences for my wife.  The support of my wife through
> this difficult time has been extraordinary – she has been my source
> of inspiration and belief that I can still do good and be a
> contributing member to society.  Without such encouragement, I

---

[1]   This quotation and those that follow are taken from reference letters written on Mr.
Siddiqui's behalf, which are attached at Exhibit 1.

don't know how it would have been possible to view life constructively.

Faizah describes Salmaan as a remarkably kind, supportive and giving husband and father. Perhaps a "silver lining" in the instant matter is that Salmaan has been able to spend more time with his wife and children than he ordinarily would have working the hours that were required by a job in finance.  Faizah states:

> He has been an extremely caring, loving, and an overall exceptional father and husband and became even more so after our eldest daughter was born. Both girls look up to him, often asking about him throughout the day and then every evening waiting by the window, paying close attention not to miss his car pull into the garage. He will flash his headlights at the window, which makes them jump with excitement. They know their hero is home. They actually prefer to be with Salmaan versus me and behave so much better with him too. It is just the charm he has with kids in general. I am often reminded by other mothers amongst our circle of family and friends as to how lucky I am to have a husband who interacts, plays, cares, and is extremely hands-on with his daughters in the manner that he does. He is the type of father that will catch throw - up with his bare hands when the kids are sick and will always clean the kids up first before him. Salmaan has always made his family top priority. Always.
>
> …
>
> Salmaan helps me in many ways and is very protective of his family. He helps take care of our daughters; feeding, bathing, changing dirty diapers, playing, teaching, reading to them every night and also waking in the night to attend to them even after working long hours. Our daughter ████ is accustomed to only Salmaan putting her to bed. She will not sleep with anyone else. Salmaan and ████ have their little night ritual; they read a book together, followed by a  "what happened today" story which Salmaan lets ████ do the talking and whenever she is done she will says," Good night Aboo" (meaning father in Urdu) and he will reply, "Ok ████ good night", and then they both say together "sleep tight, don't let the bedbugs bite". This past winter, Salmaan slipped on black ice as he rushed to get home to put the kids to bed on time. The cell phone in his hand fell causing the screen to shatter and his car key flew many yards and buried itself in the snow. Salmaan was unable to call me so he stopped at a nearby store to inform me of what happened. With a badly injured elbow

and fractured finger he managed to find the key and drive home. Once home, he was writhing in pain and still insisted on putting the kids to bed. Seeing him in his terrible state, I told him I would call a friend to drive him to the hospital. Salmaan was not keen on disturbing anyone so late in the evening. I was fortunate to contact Salmaan's childhood friend who drove him to the hospital. Salmaan came home a short while later with a sling on his elbow and splint on his finger. The next morning with his sling and splint still on, Salmaan was getting our daughter dressed and ready for school.

Salmaan's devotion as a husband and father, son, brother and uncle, is echoed by all of his family and friends. Salmaan's friend Zahir Sajad Janmohamed explains:

Salmaan has always cared for others more than he cares for himself. I see this in how he treats his wife and daughters. I see how his life has shifted radically since he got married – all he cares about his wife and daughter[s]. He would not care if he lost a limb – as long as his daughter[s] has a good life. I believe these were his exact words, in fact.

In addition, Salmaan clearly has an extraordinarily close relationship with his mother. For the past fifteen years he has been her primary financial supporter. Nasreen explains that Salmaan

has supported me ever since I lost my job. ████████████ ████████████ so he would deposit money in my account every month. He paid off my home loan. He has been everything that a mother could want in a son: honorable, loving, loyal, honest and generous.

Mr. Siddiqui also has a close relationship with his older brother and his four uncles and their families. Asif Ul-Haq Siddiqui, his cousin writes:

With the relationship I have been able to develop with Salmaan, I have no doubt he will make the appropriate amends. Salmaan has a heart of gold and I plead to the court for leniency on giving Salmaan another opportunity at life.

Haris Khan, Salmaan's brother-in-law, writes about how Salmaan helped him during his first job search out of college, assisted with drafting his resume, located relevant job vacancies,

-28-

guided him through interviews and ultimately helped Haris land a job.  In addition, he writes of how Salmaan, after a long day at work, drove Haris from DC to Boston and helped Haris through days of apartment hunting and lease negotiations.  Haris explains the following:

> Although Salmaan is technically my "brother-in-law" he has consistently treated me as his actual brother through his selfless nature, continued mentorship, and most of all, his unconditional support.  Since the first day I met him and up through today, I have only know him to be personable, caring, generous, trustworthy, honest and responsible.  He has been a personal role model for me and a constant source of sagacious guidance and advice.

Riaz Siddiqui, Salmaan's uncle writes of Salmaan's childhood and stepping in as a father figure to Salmaan,

> In turn, he was a son and even more.  He desired to accompany me to work, help me on my land surveys and engineering projects and learn from me ... The strongest quality that [Salmaan] has offered to society is his humble character.  Despite his success at college and through most of his career, his quiet and low key personality has helped establish a standard that is reflected in the youth of our family.

Javed Siddiqui Salmaan's uncle writes,

> Salmaan's commitment to his family is most easily seen by his priorities.  Salmaan always makes time for family, regardless of the distance and travel.  He came to be a part of my surprise 50[th] birthday event when he was attending Dartmouth College.  He attended all the graduation ceremonies for my children and the wedding ceremonies of both my daughters.  We take pride in our family's achievements and contributions and Salmaan embraces that.

> I will never forget the day I was diagnosed with ████████ almost four years ago.  As soon as my ██████████ was scheduled, Salman flew inform Virginia to comfort and support me.  Although his stay was short – less than a day- his presence made a lasting impact. Similarly, Salmaan came to support the Siddiqui family when my father, his maternal grandfather, suffered ████████████████ Again ... his trip showed not only his commitment to family, but his respect and honor for his elders.

Ikram and Shahana Khan, Salmaan's mother and father-in-law write,

Salmaan noticed that our garage was in poor shape, so one night, he showed up to our home with his trademark warm smile and all of the materials, and told us he wanted to renovate our garage as well. He worked late into the night tirelessly and meticulously improving the condition of our garage. He sacrificed his time, energy and resources out of his own goodwill to fulfill a need for someone else. Acts of kindness like these permeate Salmaan's character and demonstrate many of the heart-warming and exceptional traits embodied in Salmaan. He really cannot sit still without offering a helping hand or making sure that someone else is better off through his actions.

## H.   Collateral Consequences

The impact of his illegal actions on Salmaan and his family is immeasurable. As he states:

> Your Honor, I have been paying an extraordinary price for my actions and conduct. My maternal grandfather whom I have always been close to passed away shortly after my guilty plea. He was devastated hearing the news and in the midst of scheduling a trip to visit me, he ███████████. I jumped on the first available flight to see him and with God's will, I managed to spend time with him in the hospital prior to his death. I have not earned any income over the past 18 months and have my wife, two daughters and mother to support – all four depend on me financially and emotionally. My actions have not only caused harm to all of them, but I have ruined my good name, reputation, career and tarnished my good standing as an American Citizen. In order to support my family, I have been living off my savings which continue to get depleted. My wife took it upon herself to run a small business, but the process has been very slow and is yet to produce a profit. Since my wife does not have the financial resources to pay for marketing or make capital contributions, it will take a minimum of 12-18 months before the likelihood of generating a profit can be made. It's been stressful and difficult for her to commit significant time and effort into something that is yet to show any positive signs. All we can do is try what we can as a family and work hard to pick up the pieces. My level of unrest realizing how much we will need to struggle in the aftermath of my actions is very demoralizing.

Indeed, Faizah, Salmaan's wife, describes Salmaan's suffering in more detail:

> It pains me a tremendous amount to see him leave the dinner table unable to finish his meals because the outcome of his family's

future worries him that much.  It pains me a greater deal to have to write a letter of this nature about Salmaan who has always strived to do the right thing.  It saddens me to know that he does not buy himself lunch or better yet buy anything for himself because he wants to save as much money as possible for his family.

Salmaan's conduct has also had a serious impact on his immediate and extended family.

Faizah writes of the days after Salmaan's plea and the concerns for the safety of her immediate family and the numerous uncles, aunts and cousins who had come to visit to lend their support to Salmaan:

> After Salmaan plead in February, we tried our best to shield ourselves from the circulating articles related to his case. Shortly thereafter, our fears really grew for our family's safety and for all the guests staying with us when people we had not heard from in a long time started to call Salmaan, myself, and other members of our family asking what had happened. They had learned of Salmaan's charges through one of the most read publications, TIME Magazine. Out of concern for everyone's safety, Salmaan taped up thick black paper on all the windows of our home since we were short of any window coverings. When it was midday on the outside it felt as if though it were midnight from on the inside. We had to live like that for an extended period of time. The implications of the calls were as though my husband was responsible for the financial market collapse of 2008.

Faizah writes of her own psychological struggles as a result of this case

> For me, it has been very hard when [birthdays, anniversaries and other important dates] approach because the anxiety of not knowing the outcome of this case makes me sick. The nightmares are haunting and the sleep quality is very poor. The kids' first birthdays and many others "firsts" come and go but with a dark cloud hovering over our heads making these memories bittersweet.

Salmaan's mother Nasreen writes of the physical impact Salmaan's case has taken on her as a result of stress,

> Salmaan's life has been turned upside down.  Everything he ever worked for has been taken from him.  To see him suffer through this is very devastating for me.  It has impacted my health in many ways. ███████████████████████████████████

████████████████████████████

Most devastating to Salmaan is the impact his guilty plea seems to have had on his maternal grandfather. Salmaan's uncle Javed writes about learning of Salmaan's guilty plea,

> After reading the information in the articles published on the internet, I informed my father, (Salmaan's grandfather) what had happened. My father, at the time ninety years old, took the news pretty hard. He said that Salmaan should not have put himself in this situation; that he should have resigned from his job instead of doing what he did. He was so distressed by this news, that he
████████████████████████████

In addition to the emotional and physical turmoil Salmaan and his family have endured, they have also suffered severe economic consequences. It is clear that Salmaan will never work in his chosen field of financial services again. Even more significantly, however, are the financial rewards from ████ that Salmaan gave up once he became aware of the impending charges against him. Salmaan resigned from ████ in an effort to remove the company from any negative spotlight, and as a result, forfeited approximately $25 million in incentive compensation that was to vest within the year. This financial opportunity was available to Salmaan as a result of his hard and honest work at ████ where he worked as a senior portfolio manager for residential mortgage securities. This opportunity would have clearly changed his life and the lives of his family members and has been lost as a result of his conduct. He also lost $1,038,124 in incentive compensation units from CS when he was terminated in March 2008.

I. **Salmaan's Remorse**

Faizah eloquently explains how Salmaan displays his remorse for his conduct on a daily basis:

> Ever since this unfortunate situation was brought upon us, Salmaan has been extremely upset, disturbed and very remorseful. Over and over again he reminds me how deeply sorry he is for the wrong

decisions he made and takes full responsibility for them. He feels very shameful because he let his family, friends, and longtime acquaintances down. This I know because he tells me almost every day. He does not even need to tell me, I can see it in in face. He always wonders if the father he never had would be disappointed in him and wishes that he had his father right now to go to for guidance. I had, have, and will continue to have faith in my husband and know that he made a genuine mistake and has learned his lesson from it. He is truly a good man and I feel very honored to be the wife of a man which such integrity. He feels humiliated and mortified. Salmaan had earned the trust of everyone he knew and all of a sudden felt ashamed and not worthy of their friendship. For Salmaan, a person so private, the public humiliation and defamation was hard to cope with.

A heartfelt letter from Sadiq Malik, a friend for almost 20 years, details this devastation:

Most recently, I was shocked to hear about Salmaan's guilty plea in Federal Court. I got the news from Salmaan himself who reached out to me on the day he pled guilty. Given our friendship and knowing how much I looked up to him, he had not wanted me to hear about this from anyone else. While I certainly appreciated his gesture, it was his poise, dignity and empathy that had me floored. It was clear that Salmaan was utterly devastated. His entire life's hard work had been undone by one lapse of judgment. As I listened to his story, it seemed like a moment out of the movies; when life seems to stop and then slowly crumble around you. That is how I felt and so I could hardly imagine what Salmaan must be going through. But even in this moment Salmaan was less concerned about himself, but more about the damage he had caused his family and friends. He was worried about his wife, his daughter and the baby they were expecting in a few months. He was worried that he wouldn't be there for them when they would need him the most. I couldn't believe what I was hearing. In probably the worst moment of his life, Salmaan was still true to himself: thinking and caring about others before he thought of his own needs.

Haris Khan, a lawyer and Salmaan's brother-in-law, also speaks to the impact on

Salmaan and his remorse:

I would also like to note that I traveled with Salmaan to attend his plea hearing at your courthouse on February 1, 2012. Throughout the long car ride both to and from the hearing, it was clear that he was sincerely remorseful for his actions and deeply devastated by what had transpired. It was disturbing to witness him in this

-33-

troubled state, and I am certain that he has learned a great deal from this life-changing experience.

Mr. Siddiqui is dedicated to his family and they mean everything to him. He is also extraordinarily caring and keen to be helpful to others. Salmaan's giving of himself has had a profound impact on those that have been fortunate to know him. James Pomposeli, another business associate, states:

> We were men from very different backgrounds chatting about the most important things in our lives. Something struck me. As a young man, I taught Salmaan how to work at his first job. Along the way, Salmaan taught me something much more important. In a world where public opinion and often the popular press paint Muslims, in particularly Pakistanis, as terrorists with little care for their families, human life or the difference between right and wrong, Salmaan has taught me how a Muslim man could live in this country with professional ethics, a dedication to his community, a love of his family and values that represent everything that is good about America. As a man who cares deeply about his religion, holds his family above all else and has dedicated hundreds of hours of trying to teach young people in the Boy Scouts about building character, I saw all of these traits in the character in Salmaan as a young man and have not seen him waiver in his honesty, integrity, respect, loyalty and kindness to others over nearly twenty years.

Through the letters of support, it is clear that Salmaan Siddiqui is a person of strong moral character, and extraordinary generosity and compassion with an uncompromising dedication to hard work and perseverance, who made a serious error in judgment. He is a devoted husband, son, father, relative, friend, and colleague, and well regarded among his peers and business associates. The level of support and detailed letters that Salmaan has received show that those whom Salmaan has helped over the years are eager to honor their friendships and step up for him during one of his lowest hours. Significantly, many of Salmaan's supporters are prominent in the financial services industry or are highly accomplished in other fields – people who might ordinarily decline to be publically associated with a defendant in a criminal matter –

-34-

particularly given the high profile nature of this case. Without hesitation, however, Salmaan's friends and family have supported him. Their support speaks volumes about the depth and quality of the relationships that Salmaan has developed over the years. We respectfully ask the Court to take this into consideration in imposing his sentence.

### J.      Salmaan's Community Service Work

Shortly after his plea of guilty in early 2012, Salmaan sought to redeem himself and give back to his community in the most constructive way he knew how. Given his history of informal mentoring of his friends, family and colleagues, it is not surprising that he was a natural fit for the OAR program, which provides career counseling services to formerly incarcerated individuals. His friend Zahir Sajad Janmohamed explains that Salmaan's community service work at OAR "has changed [Salmaan] almost as radically as being a father changed him. He understands now first-hand that sometimes people get a bad shake and that sometimes people just want/need another shot. Salmaan has given so many people this second chance today – he is rehabilitating lives by helping them land a job." Salmaan is so passionate about his work that he told Zahir, "I should have done this earlier."

As Salmaan explains that after his plea,

> My education, life experiences, and education all seemed to evaporate before my very eyes. Humbly speaking, Your Honor, little did I realize that those very skills that evaporated before my eyes would be brought back in a way I never could have imagined. They would be brought back and applied to helping people that most of the professional world has little to no exposure to – inmates recently released from incarceration. After researching several different programs, I voluntarily joined Offender Aid & Restoration "OAR" on March 13, 2012 where I have contributed over 670 hours. With there being no employment prospects as result of my guilty plea, I wanted to stay busy, contribute and be a productive citizen.
>
> OAR is a local restorative justice program that assists in the rehabilitation of recently released inmates with a focus on reducing

recidivism. It was my personal prerogative to give back to society in a way that not only improved the safety of my community, but also wanted to find an opportunity that allowed me to positively influence others. I assist clients with school work, resumes, cover letters, finding jobs, career counseling and laying the ground work for clients to further their basic education. For the organization, I have served as a table captain for fundraising events, helped with strategic planning, reached out to local businesses to foster future employment relationships and created organizational presentations. Seeing how my work has changed and impacted the lives of so many, has been one of the most rewarding and significant accomplishments I have achieved in my life. The stories and backgrounds of many clients I have worked with has been a true inspiration in making me a better rounded individual.

Salmaan's work at OAR has had a profound impact on the organization and on the clients it services. Katy Steinbruk, Director of Programs at OAR writes:

Mr. Siddiqui or "Sal" as we refer to him, has worked with us as a kind of adjunct staff member for the past two years. Mr. Siddiqui has become the "go to" team member for clients who want to obtain employment. Our clients fight over appointments with Sal because he puts so much effort into each session with them (he usually meets with clients for a two-hour session). He does an amazing job of motivating them, clarifying their goals, organizing their job search plan and tenaciously connecting our clients with potential employers.

Sal is also the Volunteer Coordinator for OAR's Employment Program. He very patiently and in great detail trains each volunteer to assist him in working with our clients to obtain employment. He conducts volunteer orientations and then will work with a volunteer for the next two months until they are able to meet with clients individually on their own. Sal also supervises our evening employment program when we do not have enough staff available. His support of our work is irreplaceable.

Volunteers and clients rave about Sal's professionalism, knowledge of his role, and innate ability to connect with and support our clientele. I have worked with OAR for fifteen years and can honestly say that I have never met a more effective person, staff or volunteer, in reaching our clients. Sal is an inspiration to the rest of the staff and has been such a gift to our program. We have learned so much from him.

Sal's isolated conduct in connection with these charges certainly does not rule out his having acted honestly and honorably in his life. I know that he possesses and excellent professional reputation, a strong work ethic and he has been passionate about our organizations mission. He has assisted hundreds of newly released former offenders in obtaining employment through his work here at OAR. His work has had a major impact on the community and I would very much like to see him able to continue to have this kind of positive impact.

Gail Arnell, Executive Director of OAR writes:

Salmaan Siddiqui has been an invaluable resource to OAR. He has been an active an integral volunteer and supporter of our work at OAR since March 2012. Over that time he has donated his time on a regular weekly basis in multiple roles. He has worked tirelessly in our Reentry Services Department and his rapport with OAR clients has been truly representative of OAR's mission. His volunteer work has included:

> -Assisting former offenders in putting together resumes, cover letters & references in –order to market themselves and procure employment.
> -Providing emotional support and encouragement to OAR clients.
> -Assisting OAR clients with homework assignments and school projects.
> -Working with OAR clients to develop a business plan in regards to entrepreneurial ideas that they would like to pursue.
> -Serving as the 'face' of the OAR volunteer program and chosen to be the primary individual to help sell the program to others who are considering volunteering.
> -Providing training and initial orientation to new volunteers.
> -Serving as OAR ambassador at Employment Seminars for former offenders.
> -Coordinating OAR program Strategy and Developments presentations.
> -Participating in community programs and events representing OAR.

Explaining her hopes that Salmaan continues to volunteer with OAR, Gail writes:

Salmaan has already made a real difference in our work and impact, and should we be fortunate enough to continue to utilize the services of Mr. Siddiqui on a volunteer basis, he could continue

to be a valuable contributor to OAR's Reentry Services. He would be a great source of encouragement to staff, volunteers and clients alike…"

Jennie Altieri, Reentry Coach with OAR, writes:

Sal has been volunteering with PREP for 2.5 years and has become an invaluable asset to our program. Many of our clients request to work with Sal because of his patience, support and dedication to helping each client find employment and become self-sufficient.

Sal is particularly skilled at working with clients with complex behavioral issues… Sal has shown a level of patient with [client] that even some of the reentry staff struggled to maintain. His diligence and calm temperament enabled [client] to increase his motivation and focus his efforts.

Finding employment is an important part of becoming a productive and responsible citizen. Sal's commitment and service has allowed us to provide this assistance for many clients who otherwise might have slipped through the cracks.

## K.    Description of the Offense

Salmaan was hired by Credit Suisse in July 2006 as a bond trader in the Structured Credit Group at CS, with the title of Vice President. Salmaan's job was to develop trading ideas with respect to the bond market that would generate revenue for the group and to execute on those ideas. By approximately July 2007, Salmaan and the other members of his team received a directive from his supervisors David Higgs and Kareem Serageldin that all trades were to be approved by them before executing. This directive was demoralizing to Salmaan, who had previously had discretion to execute trades and as he describes "it unequivocally affected my mental outlook and ambition." Despite the revocation of his trading discretion and autonomy, Salmaan was also advised that he would receive a promotion to Director in 2008.

In September 2007, Faisal had vacation plans to travel to Pakistan for two weeks. Mr. Siddiqui was asked by David Higgs to temporarily provide pricing marks for the assets contained

in the ABN1 book, which contained several thousand positions including a variety of Residential Mortgage Backed Securities ("RMBS") as well as other asset classes. Although marking the ABN1 book was not Mr. Siddiqui's responsibility, nor had he ever marked thousands of positions at a time, Salmaan consistent with his accommodating nature, agreed to cover the ABN1 book while Faisal was away. Higgs and Faisal assured Salmaan that he would receive the guidance and support he needed to mark the book.

In late December, Salmaan agreed to the same arrangement when Faisal went on another vacation. During these two discrete time periods for which he stepped in for Faisal – approximately two weeks in September 2007 and two weeks in December 2007 (the "Relevant Time Period") - Salmaan was of course required to continue to develop profitable trading strategies for the group, which independently required extremely long hours. Given his increased responsibilities, Salmaan was at work around the clock during the Relevant Time Period. Salmaan reported directly to David Higgs with respect to his job as a bond trader and in connection with his temporary responsibility of marking the Book. As discussed above, Higgs, in turn, reported to Kareem Serageldin, the Global Head of Structured Credit at Credit Suisse, who had ultimate authority over the ABN1 book and its marks.

Unbeknownst to Salmaan, according to the government, for several months prior to Salmaan assuming Faisal's role of marking the ABN1 book, Higgs and Serageldin had been manipulating the ABN1 book to achieve certain P&L goals. Apparently, as the Government has alleged, Mr. Serageldin "wanted to demonstrate to [Credit Suisse] senior management that his trading books were profitable." *See* Information at Dkt No. 2.

On various occasions during the Relevant Time Period, Higgs reached out to Salmaan to advise Salmaan of the various marks that he (Salmaan) should be recording on the books or to

advise him of certain P&L calculations that Higgs stated should be reflected in the book. Given that the valuation of the RMBS contained in the ABN1 book was relatively subjective because the bonds were not actively trading during the Relevant Time Period, Salmaan understood that there was a range in which the RMBS could reasonably be marked based on a number of qualitative and quantitative factors.[2]  As Salmaan describes, while at first he tried in earnest to arrive at the marks Higgs had instructed him to use, at some point, Salmaan essentially took Higgs's word that the directives he provided were accurate and within the acceptable and discretionary range, because it was impossible for Salmaan to actually decipher the marks within the time period he was given.  Salmaan provides the following reasons he relied in good faith upon Higgs's representations:

- As was instilled in him from a very young age, Salmaan had an automatic inclination to respect and defer to his superiors.  Salmaan in fact deeply respected Higgs and Serageldin and believed them both to be ethical business men.

- Salmaan was under enormous time pressure by Higgs and others in the group to enter the marks and was repeatedly berated by his colleagues – including Higgs - for mistakes that occurred during Salmaan's manual entry of the marks.

- Salmaan trusted in Higgs's and Serageldin's superior intelligence with respect to the specific bonds, the ABN1 book and the structured credit market in general.

- Both Higgs and Serageldin had stellar reputations within CS – Higgs had worked at CS for 10 years and Serageldin was known for his meteoric rise within CS and was touted as the youngest head of a trading desk in all CS history.

---

[2] See, e.g., Fair Value Measurements, Statement of Fin. Accounting Standards No. 157 (as amended) (Fin. Accounting Standard Br. 2006), available at http://www.fasb.org/pdf/aop_FAS157.pdf.  The Financial Accounting Standards Board ("FASB") defined fair value as "the price that would be received to sell an asset . . . in an orderly transaction between market participants." Id. ¶ 5. FASB recognizes that "selection of where within the range" at which to value an asset requires judgment, considering both "qualitative and quantitative factors." Id. ¶ 18(a).

At some point in December, however, during the Relevant Time Period, Salmaan took a directive(s) from Higgs in marking the book that he knew bore no connection to the correct value of the bonds but instead was directly related to and satisfied a P&L directive. While Salmaan knew this was wrong, as he describes, he used the same justifications as before to convince himself it was okay:

> I deviated away from the truth and made myself believe that this indiscretion was justified by all the factors/excuses I had relied on previously. In reality, despite trying to rationalize the justification, I acted irresponsibly and disregarded the trust and obligations my employer had vested in me. This behavior was truly shameful and till this day I have been unable to escape the guilt I feel from those actions and conduct.

In addition, as Salmaan describes more fully in his letter attached as <u>Exhibit</u> 5, in September 2007, during the Relevant Time Period, in order to satisfy Higgs's request for Salmaan to obtain a third-party mark to support the values on certain bonds, Salmaan requested the marks from a small broker-dealer with whom he had a relationship. Salmaan provided the broker dealer with his views on the value of the bonds, and while Salmaan understood that the broker-dealer did his own due diligence and analysis, the broker dealer provided Salmaan with the precise marks Salmaan had suggested. While Salmaan had a good faith belief that the values he provided to the broker-dealer were accurate, he did not obtain the marks in a sufficiently independent manner. His conduct in this regard was misguided and wrong. Salmaan tried too hard to please Higgs and execute on his superior's directives during this highly stressful time and lost sight of the right thing to do.

Mr. Siddiqui fully acknowledges that, rather than comply with his superiors' directives, he should have reported their conduct and initiated an investigation. Mr. Siddiqui understands that he allowed himself to be used by his superiors and is ashamed and embarrassed that he made the decision to cooperate with their scheme. As Salmaan explains,

Destroying my career, reputation, life and future over something I could have reported to others within Credit Suisse weighs deeply inside of me each and every single day.   My actions were not driven by the hope of receiving any type of bonus or compensation what so ever.   In fact, throughout my employment at Credit Suisse I never had a single discussion about compensation, a bonus or what I would be expected to get paid.

This is why, after the mismarking came to light, Salmaan acknowledged that he had acted wrongfully, and committed himself to cooperating with both the SEC and the U.S. Attorney's Office ("USAO") in their investigation of his and his superiors' conduct.

## IV.    SALMAAN'S COOPERATION





In addition, the SEC highlighted Mr. Siddiqui's exceptional cooperation which "has extended beyond this case" through his participation on a training panel at the SEC's headquarters in Washington, D.C. on June 26, 2014 to provide his perspective on his misconduct and the workings of an effective cooperation process. *Id.* The SEC noted that with 175 staff members in attendance, "Mr. Siddiqui spoke openly, and at times emotionally, about the poor decisions that culminated in his role in the fraudulent scheme, as well as his regret at his misconduct...Mr. Siddiqui also provided information with respect to current trading practices and complex products that may be suitable for future investigation." *Id.*

Although at time of the filing of this memorandum, the USAO has not yet submitted its 5K1 letter, we have been advised by Assistant US Attorney Eugene Ingoglia that the USAO intends to submit its letter shortly. We have every reason to believe the sentiments of the USAO will closely mirror those of the SEC. Mr. Siddiqui provided comparable cooperation to the USAO as he did to the SEC, and we are confident that the government's 5K1 letter will reflect as such.

## V.   THE SENTENCING GUIDELINES

Using the 2013 Federal Sentencing Guidelines Manual (the "Guidelines"), conspiracies charged under 18 USC § 371 call for the Guideline application of the substantive offense. 18 USC § 2X1.1.  Accordingly, Salmaan's base level offense is six (6).  USSG § 2B1.1(a)(2).

### A.   Loss Calculation

Under the Guidelines, a defendant's Guidelines are increased pursuant to the loss resulting from the offense. USSG § 2B1.1(b).  If the loss "cannot be reasonably determined," the gain that resulted from the offense is used as an alternative measure of loss. USSG § 2B1.1, comment 3(B).  In this case, loss cannot reasonably be determined. *See* Siddiqui PSR ¶ 43. Therefore, the Office of Probation has based the gain calculation on the bonuses for 2007 earned by the co-conspirators in this case, to varying degrees.  Specifically, the loss amount for Serageldin was calculated using the combined 2007 year-end bonuses for Serageldin, Higgs and Siddiqui. *See* transcript of Serageldin sentencing attached as Exhibit 3 at 32.  The loss amount for Higgs represented his 2007 year-end bonus.  *See* sentencing transcript for David Higgs attached as Exhibit 4 at 10.   Here, Probation recommends that the appropriate loss number for Salmaan is $930,000, which represents the amount of Salmaan's 2007 year-end bonus.

We respectfully disagree with the proposed loss calculation of $930,000.  First, upon a review of the transcript of Serageldin's sentencing, it appears that Judge Alvin K. Hellerstein questioned the accuracy of this calculation and ultimately did not accept that aspect of Serageldin's guideline calculation.  *See* Exhibit 3 at 21-27, 32-35, 51.  Specifically, when considering the loss calculation, Judge Hellerstein stated:

> It's idle for me to really make a precise finding on how much of the bonus depended on the mismarking of the books and the cooking of the books. *Id.* at 34.

> I can't accept the argument that the entirety of the bonuses depended on the falsified books. I think it was influenced, it was affected, but I can't say it was total. So I come to the conclusion that there's a certain degree of overstatement of points. How much I don't know. *Id.* at 35.

> I take into consideration that the guidelines in terms of how it's driven by the amount of the loss is a very substantial overstatement, but the crime is a serious one. *Id.* at 51.

Judge Hellerstein ultimately sentenced Mr. Serageldin to a term of 30 months, which was significantly below the proposed guideline range of 57-60 months, in part, it appears as a result of his concerns about the overstatement of the loss calculation.

In addition, during the sentencing hearing of David Higgs in the related case *US v. Higgs*, 12 cr 88, Judge Alison Nathan seemed to deem relevant for sentencing purposes whether Higgs's bonus of $1.6 million was entirely as a result of Higgs's misconduct or whether it is "possible that it was for other conduct as well[.]" *See* Exhibit 4 at 16. Higgs's attorney conceded that the bonus was for "this conduct", presumably referring to the violative conduct for which Higgs pleaded guilty. Exhibit 4 at 16.

The gain used for Mr. Siddiqui of $930,625 cannot be said to have "resulted" from his misconduct in this case for the following reasons:

- First, Mr. Siddiqui was a bond trader and understood that his bonus was discretionary and largely based on his overall performance. Mr. Siddiqui understands that the successful trades and/or trading strategies that he executed and/or proposed during 2007 were the sole basis for his bonus award. He is not aware of any information that indicates that his bonus was awarded as a result of the mismarking for which he pled guilty, or that he would not have received a bonus had he resisted the profit and loss directives from his supervisors.

- Second, Salmaan's conduct in mismarking the ABN1 book took place on discrete occasions during the time he was tasked with marking the ABN1 book, during which he was also working full time as a bond trader. Essentially, the marking was a small part of Mr. Siddiqui's job responsibilities and only during the time that his colleague Faisal Siddiqui (whose job was to mark the books) was on vacation. Mr. Siddiqui understood that any bonus was based on his overall performance, which was based upon his performance as a bond trader.

- Third, to the extent that Mr. Siddiqui's motivations are relevant to a determination of gain resulting from the misconduct, Mr. Siddiqui has been steadfast that he was not motivated by the prospect of a bonus. Instead, he acquiesced to the directives of his supervisors, based on a misguided sense of loyalty to Higgs and Serageldin and on his submissive nature.

- Finally, CS clawed back Salmaan bonus in February 2008. Mr. Siddiqui pursued the bonus payment in an arbitration filed in August 2008, agreeing from the outset to pay his employment attorneys approximately one-quarter of any recovery. The arbitrator awarded Salmaan $930,625, representing the bonus he was to receive in February 2008. After tax, Mr. Siddiqui received $570,054 from CS and paid one-quarter ($235,431.05) to his attorneys who represented him in the arbitration pursuant to the terms of their retention. Therefore, after taxes and after payment to his employment lawyers, he received $334,622.95 from the arbitration award.

Given the foregoing, we believe a more accurate and reasonable gain calculation would be to pro-rate Mr. Siddiqui's bonus based on the portion of his bonus that can be reasonably attributed to his misconduct. We estimate that Mr. Siddiqui was tasked with marking the ABN1 book for approximately one month of the year 2007 (two weeks in September and two weeks in December). A monthly breakdown of Mr. Siddiqui's bonus equals $77,552.08 per month. Therefore, while not an exact science, we respectfully suggest that the gain attributed to Mr. Siddiqui's misconduct should be $77,522.08 representing the four weeks that he was tasked with marking the ABN1 book. Pursuant to Section 2B1.1(E), a gain of more than $70,000 and less than $120,000 results in an increase of eight (8) points.

**B.**   **Minor Role**

Under the "Mitigating Role" section of the sentencing guidelines, a court may reduce a sentence by two points if the defendant "was a minor participant in any criminal activity." U.S.S.G. § 3B1.2. The comments to this section provide that a minor participant is someone "who is less culpable than most other participants, but whose role could not be described as minimal." *Id.* cmt. n. 5. As agreed to by Probation, Salmaan "is less culpable than most other

participants, warranting a two-level decrease in the offense level pursuant to USSG § 3B1.2(a)." Siddiqui PSR at 20.

Indeed, the Second Circuit has upheld reductions of two points for a minor role where the defendant was less culpable than his co-defendants, had no prior criminal history and did not plan the transaction that resulted in the conviction despite having "knowledge of both 'the scope and structure of the enterprise' for which he was eventually convicted and 'the activities of others' who participated in the scheme." *United States v. Delacruz*, 371 F. App'x 245, 248 (2d Cir. 2010) (affirming district court's two-level minor role downward adjustment).

Mr. Siddiqui played a minor role in this offense, both in relation to his co-conspirators and as compared to the average participant in this offense. Not only did Mr. Siddiqui act under the instruction and supervision of his co-conspirators here, but he was merely filling the role of his absent co-worker, and did not have a concept of the scope of his co-conspirators conduct. Salmaan was not motivated by profit like the average participant in the crime of conspiracy to falsify books and wire fraud. Therefore, Mr. Siddiqui should receive a two (2) level reduction for his mitigating role in the offense pursuant to U.S.S.G. § 3B1.2.

C.    **Acceptance of Responsibility**

As provided for herein and in the PSR, Salmaan has clearly demonstrated his acceptance of responsibility for the offense, and has assisted authorities in the investigation or prosecution of his and his co-conspirators misconduct by timely notifying the authorities of his intention to enter a plea of guilty. Accordingly, Salmaan is entitled to a decrease of his offense level by two levels pursuant to USSG § 3E.1(a) and a reduction of one additional level pursuant to USSG §3E1.1(b).

Given that Salmaan has no prior criminal history, we calculate that the most accurate guidelines calculation for Salmaan's conduct is an offense level of nine (9), and a suggested guidelines range of four (4) to ten (10) months.

## VI.   FORFEITURE

Pursuant to 18 USC § 981(1)(c) and 28 USC § 2461, Salmaan is required to forfeit all property that constitutes or is derived from the proceeds traceable to the commission of his offense.  Federal Rule of Criminal Procedure 32.2(b) provides, in part, he court must determine "whether the government has established the requisite nexus between the property and the offense" that is sought to be forfeited. (emphasis added).

With respect to wire fraud cases, the "requisite nexus" may be established if the asset sought to be forfeited "constitutes or is derived from proceeds traceable to" a fraud violation. (citing 18 U.S.C. § 981(a)(1)(C)). The term "proceeds" is be defined, in part, as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto[.]" 18 U.S.C. § 981(a)(2)(A). As one Court has aptly described it, "[p]roceeds are property that a person would not have but for the criminal offense[.]" *United States v. Grant*, No. S4-05-CR1192, 2008 WL 4376365, at *2 n.1 (S.D.N.Y. Sept. 25, 2008)

Another court has described the "requisite nexus" standard as follows: "The requisite nexus can be established, and the property forfeited, if the property was: 'involved in' the underlying offense; is 'traceable to' property that was involved in the underlying offense; constitutes 'proceeds' of the offense; or is 'derived from' proceeds of the offense." *U.S. v. Nicolo*, 597 F.Supp.2d 342, 346 (W.D.N.Y. 2009).

Salmaan understands that his supervisors intended to reward him with a bonus of $930,000 for 2007 because of his steller trading strategies, and not because of his minor role in

the fraud.  Salmaan has no reason to believe otherwise, and his supervisors' acknowledgement of his impressive performance was clearly expressed in their intent to promote him to director well before Faisal left for vacation in September 2007 and well before Salmaan had any role in marking the book.

We understand that the theory of forfeiture that the USAO and Higgs agreed upon was approximately $900,000 representing the after tax amount of Higgs's $1.6 million 2007 bonus. We understand that the USAO intends to seek forfeiture of the full after tax bonus Salmaan received from the arbitration award of $570,054, and will consider reducing that amount by the one-quarter contingency obligation Salmaan paid to his employment lawyers of $235,431.05, for a forfeiture amount of $334,622.95

We agree that any forfeiture based on Salmaan's full bonus should necessarily exclude the contingency fee paid to Salmaan's employment counsel in the arbitration.  Any calculation that disregards the contingency payment would have the effect of disproportionally punishing Salmaan, as he never had the $235,431.05 to begin with.  From the commencement of the arbitration, one-quarter of his recovery was contractually promised to his attorneys.  Therefore, to require of Salmaan to forfeit any portion of the fees that went to employment counsel would penalize Salmaan with respect to forfeiture – the least culpable of the defendants – more so than Higgs or Serageldin by taking money he never had in the first place.

Nevertheless, as discussed in the loss section above, while not an exact science, the more accurate theory that links Salmaan's bonus to his offense conduct is to pro-rate Mr. Siddiqui's bonus only to the time frame in which he was tasked with marking the book.  Unlike loss, the forfeiture calculation should start with Salmaan's <u>after tax</u> bonus of $570,054. We estimate that Mr. Siddiqui was tasked with marking the ABN1 book for approximately one month of the year

2007 (two weeks in September and two weeks in December). A monthly breakdown of Mr. Siddiqui's after tax bonus equals $47,504.50 per month. Therefore, we respectfully suggest that the forfeiture attributed to Mr. Siddiqui's misconduct should be $47,504.50 representing the portion of his bonus, after tax, that may be attributable to the four weeks that he was tasked with marking the ABN1 book.

## VII.   A SENTENCE OF TIME SERVED IS WARRANTED UNDER 18 U.S.C. § 3553(A)

In 2005, the United States Supreme Court determined that the Sentencing Guidelines should be advisory to account for the individual circumstances of each defendant. *U.S. v. Booker*, 543 U.S. 220 (2005). Thus, when determining the appropriate sentence for an individual defendant, the Guidelines are to serve as merely one of many considerations, together with the sentencing factors set forth in 18 U.S.C. § 3553(a). *See Gall v. U.S.*, 552 U.S. 38, 50, 128 S. Ct. 586, 596 (2007) (a court must make an "individualized assessment based on the facts presented").

The Supreme Court has further instructed that a sentencing judge "may determine . . . that in the particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing," thereby expressly granting district courts the discretion to impose a sentence below the minimum suggested by the Guidelines. *See Kimbrough v. U.S.*, 552 U.S. 85, 128 S. Ct. 558, 564 (2007); *see also U.S. v. Molina*, 963 F. Supp. 213, 215 (E.D.N.Y. 1997) (commenting on "[t]he all-too-familiar harshness required by rigid federal Guidelines . . . and the depredations they wreak upon individual defendants and their families").

Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing, which include the need to:

- reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

- afford adequate deterrence to criminal conduct;

- protect the public from further crimes of the defendant; and

- provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2)(A)-(D).

In addition, § 3553(a) directs the sentencing court to consider a number of additional factors including: the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed; the kinds of sentences available; the sentencing guideline ranges; pertinent Sentencing commission policy statements; the need to avoid unwarranted sentencing disparities; and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(1)-(7).

### A.     The Nature and Circumstances of Mr. Siddiqui's Offense

As the Supreme Court explained in *Booker*, "[n]o limitations shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *Booker*, 125 S. Ct. at 760 (quoting 18 U.S.C. § 3661). A sentencing judge is permitted, and even encouraged, to find all the facts appropriate for determining the most appropriate sentence, whether that sentence is within the applicable Guidelines or not. *See U.S. v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005). Thus, the Court necessarily must consider the life circumstances and motivations that played a significant role leading up to Mr. Siddiqui's offenses.

Mr. Siddiqui's limited nature of his role in the offense and the absence of personal financial motivation are factors that warrant substantial consideration in connection with a variance application. *See United States v. Rothberg*, 222 F. Supp. 2d 1009, 1019 (N.D. Ill. 2002)

(granting downward departure in copyright infringement case "based on the combined factors of the lack of financial gain or motive, the defendant's unusual degree of acceptance of responsibility, and his family circumstances.")); *United States v. Broderson*, 67 F.3d 452, 455 (2d Cir. 1995) (affirming district court's seven level reduction in white collar contracts fraud case in part because defendant did not profit personally and because the "determination under Section 2F1.1 significantly overstated the seriousness of Broderson's conduct").

Mr. Siddiqui does not, and has never attempted to minimize the gravity of his conduct, as the offense of conspiracy is undeniably serious. However, the Court should consider that Mr. Siddiqui did not commit his offenses primarily to realize a personal gain. Instead, he crossed the line of illegality when he acquiesced to the directives of his two supervisors, Mr. Higgs and Mr. Serageldin. As his mother Nasreen states, "Salmaan does have one very big weakness. He does not know how to say no." He was taught to respect and defer to his superiors, and not to question authority. This coupled with his inherent nature to be non-confrontational and to please his superiors undoubtedly contributed to his ill-advised decisions in this matter. *See* Bob Van Voris, *Disney Earnings Leaker Hoxie Sentenced to Home Confinement*, BLOOMBERG (February 22, 2011, 3:01 PM), http://www.bloomberg.com/news/2011-02-22/disney-earnings-leaker-hoxie-sentenced-to-home-confinement-1-.html (discussing *U.S. v. Hoxie*, No. 10-CR-879 (S.D.N.Y. 2011) where defendant claimed she was "blindsided by love," and Judge Hellerstein agreed that she was a "vulnerable person" who "was manipulated" and imposed a sentence of home confinement) *See* Exhibit 7; *see also* Michael Hytha, *Galleon Defendant Hariri Prepares for Prison, Hopes for Rebound*, BLOOMBERG (January 7, 2011, 10:27 AM), http://www.bloomberg.com/news/2011-01-07/galleon-insider-defendant-hariri-prepares-for-prison-regrets-big-mouth-.html (discussing *U.S. v. Hariri*, No. 09-CR-02436 (S.D.N.Y. 2011)

-52-

where Judge Holwell imposed a below-guidelines sentence, stating: "This reflects in part that the defendant's motivation was not entirely economic but was to some degree, perhaps some important degree, based on his obviously mistaken idea of his friendship"). *See* Exhibit 8.

We respectfully submit that this Court should also consider Mr. Siddiqui's motive to follow instructions of his superiors– albeit a misguided motive – by imposing a sentence of time served.

### B.   A Substantial Variance is Warranted Because this Crime Reflected Aberrational Behavior

As is clear from the factual basis, the offense to which Mr. Siddiqui pled guilty occurred approximately twice during the Relevant Period when Faisal Siddiqui whose daily job was to mark the books went on vacation.  Salmaan was under pressure not only in his own job but also assuming Faisal's additional responsibilities.   In addition, as the Presentence Investigation Report and letter to the Court make abundantly clear, this regrettable crime represents a marked deviation from an otherwise law-abiding life.   Never before has Salmaan had any contact with the criminal justice system.   Moreover, he has never had any ethical issues or professional misconduct in his career.

The court has discretion to depart downward for aberrant behavior "only if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. § 5K2.20.[3]  Interpreting this

---

[3]   The Sentencing Commission adopted 5K2.20 in response to a circuit split on the definition of aberrant behavior. *United States v. Gonzalez*, 281 F.3d at 44.  The provision, which became effective on November 1, 2000, eliminates the factors "single act" and "spontaneity" from considerations of downward departure for aberrant behavior. *Id.*  However, the Application Notes state that the court may consider the defendant's "(A) mental and emotional conditions; (B) employment record; (C) record of prior good words; (D) motivation for

provision, the Second Circuit has explained that the court may consider factors "such as the defendant's employment record and prior good works." *United States v. Gonzalez*, 281 F.3d 38, 46 (2d Cir. 2002); *see also United States v. Ritchey*, 949 F.2d 61, 63 (2d Cir. 1991) (recognizing that district court has the legal authority to depart downward by taking into account various factors, and that a "single act of aberrant behavior may justify downward departure" (citing *United States v. Dickey*, 924 F.2d 836, 838 (9th Cir. 1991) *cert. denied,* 502 U.S. 943 (1991)).

In *U.S. v. Khan*, the Second Circuit upheld the district court's determination that defendant's behavior qualified as "aberrant" and warranted a downward departure during his sentencing for conspiracy to commit bulk cash smuggling, where the evidence showed that the "money that Akbar Khan was expatriating for himself was evidently accumulated by his own honest labors, and the planning consisted of little more than wrapping the cash in sealed parcels and putting them in his luggage." 94 F. App'x 33, 37 (2d Cir. 2004). Although defendant's criminal conduct in conspiring to smuggle occurred on a number of separate occasions (collecting the money, planning to meet at the airport to board the flight to Pakistan, etc.), the court found that it met the criteria of USSG § 5K2.20 and was committed "without significant planning" and was "of limited duration." *Id.*

Similarly, Mr. Siddiqui's conduct, while it may have occurred on separate occasions, was committed without any planning, and was of finite duration. In a post-*Booker* framework, such aberrational conduct is a valid basis for a variance. *See United States v. Howe*, 543 F.3d 128, 132 (3rd Cir. 2008) (affirming probationary sentence and temporary home confinement for wire fraud despite an 18-24 month guideline range, where the offense was found to be an "isolated mistake" in the context of Howe's otherwise long and upstanding life, despite the government's

---

committing the offense; and (E) efforts to mitigate the effects of the offense." Application Notes of 5K2.20 at 3.

assertion that Howe waged a two-year campaign to cover up a six-figure fraud on the Air Force);

*United States v. Carson,* 560 F.3d 566, 590-91 (6th Cir. 2009) (affirming a two-level reduction

for aberrant behavior resulting in a 15-21 month guideline range, from which the judge further

varied to impose three years' probation for conspiring to obstruct justice, where  co-defendant

policeman had "not a single [citizen] complaint...and there was not any chance the defendant

would commit further crimes."); *United States v. Paul,* 239 F. App'x 353 (9th Cir. 2007)

(vacating defendant's 16-month sentence, the top end of the guideline range for unlawful receipt

of federal funding, as unreasonably high where defendant was a first-time offender, returned the

funds, and displayed remorse); *United States v. Leyva-Franco,* 162 F. App'x 751 (9th Cir. 2006)

(affirming four-level reduction for aberrant behavior where evidence showed defendant's drug

smuggling was single criminal event, with no significant planning, of limited duration, and

representing marked deviation from otherwise law-abiding life); *United States v. Houchin,* 2007

WL 3374595 (E.D.Ark. Nov. 6, 2007) (granting a departure or in the alternative a variance based

on defendant officer's exemplary record, aberrant conduct, and his involvement in the

community). Here, there is ample basis to support a variance for aberrant behavior.

### C.   Mr. Siddiqui has Demonstrated Extraordinary Acceptance of Responsibility, Extreme Remorse, and Substantial Assistance Which Warrants a Substantial Variance

The advisory guidelines allow for a court to depart from the guidelines based on a motion

from the government stating that the "defendant has provided substantial assistance in the

investigation or prosecution of another person who has committed an offense" under USSC

§5K1.1.  The guidelines provide a non-exhaustive list of reasons the court may take into

consideration in making an appropriate downward departure from the sentencing guidelines,

including but not limited to:

"(1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3) the nature and extent of the defendant's assistance;

(4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

(5) the timeliness of the defendant's assistance."

U.S.S.C. § 5K1.1. In addition, the commentary to the advisory guidelines specifically notes that the reduction for assistance to authorities under section 5K1.1 should "be considered independently of any reduction for acceptance of responsibility." (§ 5K1.1, comment., n. 2). The comment distinguishes between the two, noting that "[s]ubstantial assistance is directed to the investigation and prosecution of criminal activities by persons other than the defendant, while acceptance of responsibility is directed to the defendant's affirmative recognition of responsibility for his own conduct." *Id.* Therefore, it is still within the court's discretion to depart from the guidelines under § 5K1.1 and make a further downward departure despite already having made the two-level decrease under § 3E1.1 for acceptance of responsibility.

Mr. Siddiqui has earned the application of both substantial assistance under § 5K1.1 and acceptance of responsibility under U.S.S.G. § 3E1.1. In Mr. Siddiqui's case, significant facts strongly support a substantial departure as well as a variance.

███████████████████████████████  Mr. Siddiqui provided full and complete cooperation to the government. ████████████████████████████████████ to June 2014 with numerous proffers and meetings with a variety of investigating agencies as well as follow-up inquiries. Furthermore, as discussed above, Mr. Siddiqui's cooperation has continued until last month when he participated in an SEC training regarding cooperation – the

first program of its kind to present the perspective of a cooperator.  This cooperation involved both the civil investigation by the Securities and Exchange Commission as well as the criminal investigation conducted by the United States Attorney's Office.   A complete log of Mr. Siddiqui's cooperation is attached as Exhibit 9.

Based upon previous case law, this extensive cooperation merits consideration for a variance in addition to a departure. *See United States v. Swift*, 2008 WL 2906884 (N.D. Ind. July 28, 2008) (granting reduction of 10 months from the guideline range to impose the mandatory minimum, citing, among other things, defendant's acceptance of responsibility and reasoning that the additional ten months would serve no deterrent or retributive purpose to the defendant, nor make any large difference in deterrence); *United States v. Finnigin*, 2007 WL 4201167, at *1 (D.Kan. Nov. 27, 2007) (finding downward variance of twelve months was warranted for "defendant's voluntary conduct in contacting the police, disclosing that he was wanted for robbery, and turning himself in and accepting responsibility for the robbery."); *United States v. Milne*, 384 F. Supp. 2d 1309, 1312 (E.D.Wis. 2005) (finding that acceptance of responsibility adjustment and 18-24 month range failed to fully account for defendant's voluntarily informing bank of his misconduct and significant early efforts to repay, explaining "courts may grant additional consideration to defendants who demonstrate acceptance beyond that necessary to obtain a two or three level reduction under §3E1.1.  This is so because such conduct bears directly on their character, §3553(a)(1), and on how severe a sentence is necessary to provide deterrence and punishment, §3553(a)(2)."); *United States v. Fagan*, 162 F.3d 1280, 1284-85 (10th Cir. 1998) (explaining that while remorse is a factor to be taken into account under §3E1.1 acceptance of responsibility guideline, courts may further depart where defendant showed remorse "to an exceptional degree" because guidelines do not expressly forbid the departure).

-57-

For the foregoing reasons, Mr. Siddiqui has earned the application of both substantial assistance under § 5K1.1, acceptance of responsibility under U.S.S.G. § 3E1.1, and significant facts strongly support a substantial departure as well as a variance for his extraordinary acceptance of responsibility.

**D.     Mr. Siddiqui's Exceptional Charitable and Community Service Warrant a Significant Variance**

Mr. Siddiqui has a demonstrated commitment to his community, charitable endeavors and those otherwise in need of help. His commitment is greater than that of the ordinary individual and the letters submitted describe a man worthy of this Court exercising its discretion in granting a variance. In March 2012, when Mr. Siddiqui was forced to leave paid employment as a result of his plea, he dedicated himself to a substantial community service program with Offender Aid and Restoration (OAR) in Arlington, Virginia. In the past 27 months, Mr. Siddiqui has volunteered over 670 hours of his time to assisting individuals who are facing reentry from incarceration (*see* Exhibit 9 for a complete log of his community service activities).

While under Section 5H1.11 of the Sentencing Guidelines "[c]ivic, charitable...and similar prior good works are not ordinarily relevant in determining whether a departure is warranted," the Supreme Court has held that a court may still depart from the guidelines if the discouraged factor "is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Koon v. United States*, 518 U.S. 81, 96 (1996). A defendant's charitable contributions can justify a downward departure from the sentencing guidelines. *See United States v. Greene*, 249 F. Supp. 2d 262, 264 (S.D.N.Y. 2003) (granting downward departure of seven points and sentence of probation rather than incarceration based on defendant's "extraordinary history of charitable work and community

service" volunteering with Big Brothers, Big Sisters of America); *United States v. DiMattina*, 885 F. Supp. 2d 572, 582 (E.D.N.Y. 2012) (noting the "numerous letters attesting to his good character and many acts of charity" in assessing the factors meriting a below-guidelines sentence).

Prior to *Booker*, charitable or public service, employment related contributions, and similar prior good works were discouraged grounds for a reduction of a guidelines sentence. That is no longer the case, however, and Courts are permitted to consider these factors in evaluating a variance. *See United States v. Thurston*, 544 F.3d 22 (1st Cir. 2008) ( affirming district court's sentence of three months rather than 60 month guideline term for Medicare fraud conspiracy of more than $5 million, citing, among other things, defendant's charitable work, community service, and generosity with the time he provides others); *United States v. Cooper*, 394 F.3d 172, 177 (3d Cir. 2005) (affirming 4-level reduction to probation in securities fraud and tax evasion care based on defendant's good works despite guidelines call for 14-21 months where defendant did not simply donate money to charity but organized and ran youth football team in depressed area and helped members attend better schools and go to college which court described as "hands on personal sacrifices, which have had a dramatic and positive impact on the lives of others."); *see also United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000) (finding that defendants' "generosity with his time as well as his money" warranted a significant departure); *United States v. Woods*, 159 F.3d 1132. 1136 (8th[th] Cir. 1998) (affirming downward departure for defendant's "exceptional" charitable efforts in taking in two troubled young women, financing their private education, and assisting an elderly friends' move from a nursing home).

**E.     The Serious and Significant Collateral Consequences That Have
Resulted from Mr. Siddiqui's Guilty Plea Warrant a Meaningful
Variance**

As a result of his offense, Mr. Siddiqui will be permanently barred from the only
profession he has known in his career.  Simply put, he must begin a new career and may never
again work in the securities industry.  This specific collateral consequence is significant and has
serious adverse consequences.

These collateral consequences are a severe punishment for a man that will have difficulty
in starting a new career.  Respectfully, Section 3553 was drafted to take such facts into
consideration.  *See United States v. Gardellini*, 545 F.3d 1089, 1091 (DC Cir. 2008) (upholding
non-guidelines sentence of probation and a fine for defendant convicted of filing false tax returns
where guidelines range was 10-16 months because defendant had accepted responsibility, posted
a minimal risk of recidivism, and "had already suffered substantially due to his prosecution" and
been treated for stress); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D.Wis. 2005)
(noting that where defendant was convicted of fraud, sentence below guideline warranted in part
because "as a consequence of his conviction and sentence, defendant lost a good public sector
job, another factor not considered by the guidelines."); *United States v. Redemann*, 295 F. Supp.
2d 887, 894-97 (E.D.Wis. 2003) (departing downward where defendant was "subjected to
substantial amounts of adverse publicity, which caused direct and collateral harm to him and his
family," in addition to the negative impact on his business).

**F.     The Need to Avoid Unwarranted Sentencing Disparities**

Importantly, David Higgs, Mr. Siddiqui's direct supervisor and one of the co-conspirators
in this scheme to mismark the books, received a sentence of time served by Judge Alison J.
Nathan on June 26, 2014. (U.S. v. Higgs, 1:12-CR-00088, Doc. 28).  In the Government's
Sentencing Submission, the government noted that "Higgs, in turn, instructed other subordinates,

-60-

including a trader who worked for Higgs named Salmaan Siddiqui, to mark the books in such a way to achieve the particular targets that were directed by Serageldin." (U.S. v. Higgs, 1:12-CR-00088, 22 at 3).  As acknowledged by Probation, Mr. Siddiqui's minor participation in this scheme was directed by Mr. Higgs.

One of the factors courts should consider in imposing a sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  While this provision has generally been held to require a district court to consider nationwide sentence disparities, a court may consider the similarities and differences among co-defendants, but if a reduction is made based on a co-defendant's lesser sentence, those co-defendants must be similarly situated:

> We do not, as a general matter, object to district courts' consideration of similarities and differences among co-defendants when imposing a sentence. In this respect, we agree with the Third Circuit's approach to co-defendant sentence disparities set forth in *United States v. Parker*, 462 F.3d 273 (3d Cir.), cert. denied, --- U.S. ----, 127 S.Ct. 462, 166 L.Ed.2d 329 (2006). The Third Circuit determined that "although § 3553(a) does not require district courts to consider sentencing disparity among co-defendants, it also does not prohibit them from doing so. So long as factors considered by the sentencing court are not inconsistent with those listed in § 3553(a) and are logically applied to the defendant's circumstances, we accord deference to the court's 'broad discretion in imposing a sentence within a statutory range.' " *Id.* at 277 (quoting *Booker*, 543 U.S. at 233, 125 S.Ct. 738).

*United States v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007) (abrogation recognized on other grounds by *United States v. Thavaraja*, 740 F.3d 253, 255 (2d Cir. 2014).

*Cf United States v. Chervin*, 553 F. App'x 63, 64 (2d Cir. 2014) (finding that the district court did not commit procedural error by refusing to reduce defendant's sentence where defendant failed to show that he was similarly situated to his co-defendants for various reasons, "including that he was the only defendant in this case to go to trial and he did not accept

responsibility."). Therefore, a district court may consider the sentences imposed on co-defendants in order to avoid unwarranted sentence disparities among defendants, provided the co-defendants are similarly situated with respect to the crime at issue.

Not only do the Federal Sentencing Guidelines recognize the importance of avoiding disparities between sentences, the Sentencing Reform Act established the United States Sentencing Commission whose sole purpose is to establish uniform sentencing policies that avoid "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct." 28 U.S.C. § 991 (b)(1)(B).

Mr. Siddiqui is similarly situated to his co-defendants, specifically Mr. Higgs, who recently received a sentence of time served in this case. Mr. Siddiqui, like Mr. Higgs, accepted responsibility for his actions and cooperated with the government. Because these co-defendants are similarly situated, we respectfully urge that the court should avoid unwarranted sentencing disparities pursuant to 18 U.S.C. § 3553(a)(6) among co-defendants in this case, and sentence Mr. Siddiqui to no harsher a sentence than that already given to his direct supervisor, Mr. Higgs – time served.

### G.      Mr. Siddiqui's Work Ethic, Education and Strong Character Suggest that He Will Continue to be an Asset to Society

Salmaan's challenged beginnings in Sacramento, his desire to be accepted in this country, his dedication to hard work and education, his commitment to his family, friends and colleagues, and his success in a competitive field each demonstrate his ability to overcome adversity and excel while exhibiting a strong sense of character. Courts have found that these traits also warrant the imposition of a non-Guidelines sentence. *See United States v. Caruso*, 814 F. Supp. 382 (S.D.N.Y. 1993) (sentencing defendant to three years' probation instead of 12 to 18 months' imprisonment where the "totality of the circumstances" including "good employment record, and

likely future compliance with the law" justified a downward departure); *U.S. v. Morales*, 2010 WL 3781017, at *2 (E.D.N.Y. 2010) (sentencing defendant to five years' probation, noting that she had "educated herself despite coming from deprived circumstances" and finding it "unlikely that she will engage in further criminal activity in light of her remorse and her strong sense of personal responsibility"); *U.S. v. Goltson*, 2010 WL 4023299, at *2 (E.D.N.Y. 2010) (imparting a non-Guidelines sentence of time served where defendant grew up in severe poverty and overcame such circumstances, and "by the impact this conviction will have on his employability" as well as the fact that it is "unlikely that he will engage in further criminal activity in light of his…close familial connections…and his genuine remorse for his crime.").

Like the defendants in Caruso, *Morales* and *Goltson*, Salmaan overcame difficult circumstances to earn an education at an Ivy League college – the first in his family to do so. He created a successful life for himself and his family and helped to foster the education and careers of all those he had the opportunity to advise and mentor. He continues to devote his time and energies to his family, friends and now the clients at OAR who so desperately need his expertise to succeed in the work place. His conduct to date evidences that he will continue to have a tremendous impact on the success and well-being of those around him.

### H. The Need for the Sentence Imposed

Pursuant to section 3553(a)(2), the Court is required to consider the "need for the sentence imposed," which requires consideration for the general purposes of sentencing, including the need to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes by the defendant. *See United States v. Park*, No-13-cr-4142, 2014 WL 3289493, at *10 n.10 (2d Cir. July 9, 2014) (citing 18 U.S.C. § 3553(a)(2)).

A sentence of time served reflects the seriousness of Mr. Siddiqui's offense, promotes respect for the law, and provides just punishment. *See* 18 U.S.C. § 3553(a)(2)(A). Both general deterrence and specific deterrence will be satisfied by a sentence of time served. *See* § 3553(a)(2)(B). In order for general deterrence to be effected, the sentence must provide a clear message that any involvement in the charged conduct will result in a substantial sentence. See *Goltson*, 2010 WL 4023299, at *2 (finding that a sentence of time served would send a clear message that drug trafficking would result in a substantial sentence).

A sentence of imprisonment is not necessary to deter potential violators of the securities laws. Mr. Siddiqui has essentially served a term of approximately one and a half years of community service through his volunteer work at OAR. In addition, Mr. Siddiqui's conduct has been the subject of extensive press coverage. Mr. Siddiqui's circumstances have undoubtedly sent a clear message to those on Wall Street regarding the importance of integrity and ethics in the valuation of securities.

Specific deterrence is also satisfied because Mr. Siddiqui's employability is directly and negatively impacted by his conviction. *See Goltson*, 2010 WL 4023299, at *2 (finding that the impact of conviction on the ability to find employment will deter the defendant from committing further crimes); *U.S. v. Cowan*, 2010 WL 694098 (E.D.N.Y. 2010), at *2 ("Specific deterrence is achieved through the impact of this conviction on the defendant's employability."); *U.S. v. Gayle*, 2010 WL 2540488 (E.D.N.Y. 2010), at *2 (finding specific deterrence was satisfied where the defendant was likely to lose her law license). Because Mr. Siddiqui has been barred from working in the securities industry, specific deterrence has been satisfied in this case. Mr. Siddiqui's livelihood in the field that he knows has been lost, and he will never again be in a position to commit a similar offense. *See* Exhibit 5.

Specific deterrence is further satisfied when the defendant lacks any prior criminal history, when the defendant is a hard worker with long employment history, and when the defendant has strong family ties and needs to support his or her family. *See Cowan*, 2010 WL 694098, at \*2 (finding that defendant had a "long history of law-abiding behavior" and a good employment history); *Gayle*, 2010 WL 2540488, at \*2 (specific deterrence achieved due to her "strong family ties, and the need to care and provide for her young son"); *U.S. v. Genis-Maldonado*, 2010 WL 3125663 (E.D.N.Y. 2010), at \*2 (finding that defendant was unlikely to engage in criminal activity since he did not want to be separated from his children and financially supported his family).

Like the defendants in *Goltson, Cowan,* and *Gayle*, Mr. Siddiqui's ability to find any work, much less work in the financial services industry in which he worked so hard to succeed, will be severely impacted by his conviction. Mr. Siddiqui has also led a law-abiding life outside of the instant offenses, where he had undeniably strong ties to his family. Accordingly, Mr. Siddiqui has endured adequate punishment to reflect the seriousness of his offense and to sufficiently deter any future offender.

Singularly, or in the aggregate, there is ample authority to support a district court's discretion to grant a variance a defendant on a number of grounds. Here, Salmaan clearly exhibits several: aberrant conduct, extraordinary acceptance of responsibility, exceptional charitable and community service, serious and substantial collateral consequences, and the very limited nature and circumstances of his involvement in the underlying conduct, his history of giving of himself to friends and family, as well as the need to avoid unwarranted sentencing disparities. We respectfully request that the Court exercise that discretion and in addition to the

-65-

Government's USSC §5K1.1 motion, vary Mr. Siddiqui's sentence downward and impose a sentence of time served.

## VIII.  <u>CONCLUSION</u>

For the foregoing reasons, on behalf of Salmaan Siddiqui we respectfully submit that a sentence of time served is a sentence that is sufficient but not greater than necessary.

Dated:   July 25, 2014
        New York, New York

                        LOWENSTEIN SANDLER LLP

                        By:    /s Nicole P. De Bello
                              Nicole P. De Bello

Of Counsel:                    1251 Avenue of the Americas
Ira Lee Sorkin, Esq.            New York, New York 10020
Alexandra S. Droz, Esq.        Tel: 212.262.6700
                              Fax: 212.262.7402
                              E-mail: ndebello@lowenstein.com
                              *Attorneys for Defendant Salmaan Siddiqui*