```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
 ------------------------------------  X

  UNITED STATES OF AMERICA            :

                                      :    12 Cr. 89 (PAC)
      - v. -
                                      :

  SALMAAN SIDDIQUI,
                                      :
                  Defendant.
                                      :
 ------------------------------------  X
```

**GOVERNMENT'S SENTENCING SUBMISSION**

```
                                       PREET BHARARA
                                       United States Attorney for the
                                       Southern District of New York,
                                       Attorney for the United States
                                            of America.


EUGENE INGOGLIA
Assistant United States Attorney
     Of Counsel.

July 28, 2014
```

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x
UNITED STATES OF AMERICA              :
                                      :    12 Cr. 89 (PAC)
      - v. -                          :
                                      :
SALMAAN SIDDIQUI,                     :
                  Defendant.          :
------------------------------------- x
```

## **GOVERNMENT'S SENTENCING SUBMISSION**

The Government submits this memorandum in connection with the sentencing of defendant Salmaan Siddiqui, currently scheduled for July 30, 2014, and in response to his written sentencing submission dated July 25, 2014 ("Def. Br."). The Government respectfully submits this memorandum, pursuant to Section 5K1.1 of the Sentencing Guidelines, to advise the Court of the pertinent facts concerning the assistance that Siddiqui has rendered in connection with the above-referenced case. By rendering such assistance, which was important, Siddiqui provided substantial assistance in the investigation and prosecution of other persons. Accordingly, the Government moves pursuant to Section 5K1.1 of the Sentencing Guidelines, that the Court sentence the defendant in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines, and consistent with the recommendation of the United States Department

of Probation ("Probation") as set forth in its Pre-Sentence Investigation Report ("PSR").

I. **Offense Conduct**

The defendant was charged in a one-count Information (the "Information") on February 1, 2012.  The Information charged Siddiqui with conspiring to falsify business records and commit wire fraud, from in or about August 2007 through February 2008. (PSR ¶ 1).  This charge was brought in connection with a scheme by the defendant's boss, David Higgs, and Higgs' boss, Kareem Serageldin ("Serageldin") and other employees of Credit Suisse Group ("CS"), to mis-mark the values of certain securities in order to create the false appearance of profitability in a trading book for which Serageldin was ultimately responsible, which Higgs oversaw, and for which Siddiqui had, on some occasions, responsibility for setting the marks.

Specifically, in 2007 and the beginning of 2008, Serageldin was employed at CS as a Managing Director and held the title of Global Head of the Structured Credit Group in the Securities Department of the Investment Banking Division, principally working out of the bank's London office.  (PSR ¶ 9).  In that role, Serageldin oversaw and managed a number of trading books, including one known as "ABN1". The ABN1 book was comprised primarily of several thousand individual long and short subprime-related positions.  The long positions consisted of various types of cash and synthetic

securities, including AAA-rated and non-AAA-rated cash bonds, among others.  (PSR ¶¶ 9-10).  Higgs reported directly to Serageldin, as a Managing Director in the Investment Banking Division, and principally worked out of the London office of the bank.  (PSR ¶ 11). Salmaan Siddiqui, the defendant, was a Vice President at CS, based in the New York, New York office, and reported to Higgs. (PSR ¶ 12). A co-conspirator was usually responsible for marking the securities in the ABN-1 book; but when he was away, Salmaan Siddqui, the defendant, had that responsibility. (PSR ¶ 12).  During the relevant period, Salmaan Siddiqui had primary responsibility for marking the book during two separate two-week periods; on the other occasions, a colleague of Salmaan Siddiqui ("CC-1"), with whom he closely worked, had that responsibility.

    CS employees were required to price, or "mark", securities they held on a "mark-to-market" basis at its fair value – that is, at a price that would be received to sell the security.  (PSR ¶ 14). The deterioration throughout 2007 of the real estate market in the United States, including the subprime housing market, led to significant reductions in the value of mortgage-backed securities. Specifically, as mortgage delinquencies increased across the country, the value of the securities backed by these mortgages decreased and the market for them became increasingly illiquid. (PSR ¶ 15).  In the absence of a liquid market (in which the value of the particularly securities typically would be reflected by its

trading price), CS traders were required to determine the fair value of the assets on their books. (PSR ¶ 16).

Instead, the defendant (and his co-conspirators) cheated by deliberately causing the trading book to be marked in ways designed to reach particular profit and loss objectives, hiding the true extent of the losses in the book. (PSR ¶ 17). Beginning in the fall of 2007 and into the beginning of 2008, Serageldin directed Higgs on numerous occasions to reach specific profit and loss ("P&L") targets on a daily and month-end basis; Higgs, in turn, instructed other subordinates, including Salmaan Siddiqui, to mark the books in such a way to achieve the particular P&L targets that were directed by Serageldin. (PSR ¶ 19). As a result, positions were valued in ways designed to achieve particular P&L goals, rather than to reflect their true market value, the false impression of profitability was created, and the bank's books and records were caused to be inaccurate. (PSR ¶¶ 17-20).

In addition to the mis-markings that took place on individual days, the book also was more generally over-valued as a result of the actions of Higgs and the other co-conspirators. This ultimately resulted in inaccurate books and records for the bank at year-end, and contributed to CS's decision to restate its publicly filed financial statements. (PSR ¶¶ 37-41). At year-end, the bank's books and records related to the ABN1 trading book, and ultimately the bank's public filings, were overstated by more than

4

$100 million.  (PSR ¶ 42).

Siddiqui took part in the conspiracy throughout the period of the charged conspiracy.  He made specific contributions in two principal ways.  First, he mis-marked the book on days when he had that primary responsibility, which included the last two–weeks of fiscal year 2007. (PSR ¶¶ 36-38).  In addition, in August 2007, to support the inflated prices at which the bonds were marked, Siddiqui obtained favorable prices for a number of bonds in the ABN1 book from a colleague who worked at a small regional investment bank; the prices, generated by the colleague in less than a minute, were nearly identical to those first communicated to his colleague by Siddiqui, and to the marks used by the co-conspirators for the bonds in the ABN1 book. (PSR ¶¶ 29-30).

Serageldin, Higgs, Siddiqui and their co-conspirators received sizeable compensation from CS for their job performance in 2007.  Serageldin and Higgs each received a bonus of approximately $1.6 million.  Siddiqui, after being paid his bonus, had it taken away by CS; ultimately after mediation, Siddiqui was re-awarded his bonus of $930,625, the after-tax portion of which totaled $570,054. (PSR ¶ 43).

## II.   Procedural Background

Beginning in October 2010, after his attorneys had been in contact with representatives of the Securities and Exchange Commission ("SEC"), Salmaan Siddiqui began meeting with

representatives of the SEC and, thereafter, the United States Attorney's Office and agents of the Federal Bureau of Investigation. Before anyone in the case was charged, Siddiqui began cooperating with the investigation. Subsequently, law enforcement reached out to Higgs, a citizen of the United Kingdom, and, unbeknownst to Siddiqui, Higgs began cooperating as well.

On February 1, 2012, the defendant pleaded guilty to Count One of the Information before Your Honor, pursuant to a cooperation agreement with the Government, acknowledging his part in the conspiracy to commit wire fraud and falsify the books and records of the bank. (PSR ¶ 4). The cooperation agreement does not contain a Sentencing Guidelines calculation.

### III. The Sentencing Guidelines

In the PSR, Probation has calculated the applicable Sentencing Guidelines range for the defendant as 18 to 24 months' imprisonment, based on a total offense level of 15 and a criminal history category of I. (PSR ¶ 95). The offense level was calculated as follows: a base offense level of 6, pursuant to Guidelines Section 2B1.1(a)(2), a 14-level increase because the loss that resulted from the offense was between $400,000 and $1 million, pursuant to Guidelines Section 2B1.1(b)(1)(H); a 2-level decrease because the defendant was a minor participant in the offense; and a 3-level decrease for pleading guilty and avoiding the need for trial, pursuant to Guidelines Sections 3E1.1(a) and 3E1.1(b). (PSR

¶¶ 43, 47-57, 59). The Government agrees with this calculation.

The defense offers several arguments as to why a different, smaller number should be used as the loss amount. For the reasons set forth below, these arguments should be rejected.

A. <u>The Guidelines Calculation Employed by Judge Hellerstein in Sentencing Serageldin, is the Same Calculation that the Government and Probation Employ for Siddiqui</u>

First, the defense argues that Judge Hellerstein, during the sentencing of Serageldin, questioned the accuracy of this calculation and "did not accept that aspect of Serageldin's guidelines calculation." (Def. Br. 44-45.)  To the extent this argument suggests that the Court did not use the bonus amount a basis for the loss amount in the Guidelines, this is simply incorrect.

Serageldin pleaded guilty pursuant to a plea agreement that contained a stipulated Guidelines calculation.  Judge Hellerstein explicitly stated that he was calculating the applicable Guidelines precisely in the manner as the parties had agreed:  "His plea of guilty contained a discussion of the sentencing guidelines, **and I find them to be the same as that which was agreed.**"  (Sent Tr. 2, Def. Ex. 3 (emphasis added)).  Judge Hellerstein did impose a below-Guidelines sentence, based on his balancing of various factors under Section 3553(a), including a view that the Guidelines overstated to some degree the culpability of Serageldin, who had responsibility for some 30 different trading books including the ABN1 book at issue in the case.

7

Judge Hellerstein did not, however, calculate the Guidelines differently than the parties.[1] Instead, he employed precisely the Guidelines analysis that the Government and Probation have employed with respect to Siddiqui.

B. The Loss Amount Should Not Be "Pro-Rated"

Second, the defense argues that, in fashioning an appropriate loss amount, the amount of Siddiqui's bonus should be pro-rated to reflect, variously, the amount of time he devoted to the fraud during the year in question (Def. Br. 45); the relative degree that the prospect of a bonus, it is argued, motivated the crime (as opposed to acquiescence to his superiors' directives and his "submissive nature") (Def. Br. 46); and a deduction for the attorneys' fees that Siddiqui had to pay to get CS to pay him his bonus. (Def. Br. 46). For the reasons set forth below, these arguments are unpersuasive and should be rejected.

First, there is no question that, had the bank known that Siddiqui was participating in a fraudulent conspiracy to inflate the value of bonds on CS's books, the bank would not have paid him any bonus at all. The bank demonstrated this by withdrawing his bonus and clawing back the money once the fraud was discovered, shortly after the bonus had been issued.[2] Simply put, the defendant's fraud

---

[1] Nor did Judge Nathan, in her sentencing of Higgs.
[2] Indeed, this is the reason Siddiqui had to employ attorneys to try to recover his bonus from CS.

8

was part of his "overall performance" and had the bank known of it, he would not have received a bonus. For a fraud that involved an aspect of a defendant's job duties, and specifically the trading book for which the defendant shared responsibility, and which impacted the employer and the employer's statements to the public, it is not reasonable to pro-rate the loss amount by some itemized estimate of the number of hours devoted to the fraud.

Similarly, the precise parsing of the defendant's psychological motivations is not a reasonable basis for pro-rating the bonus amount to come to a discounted loss number. While the defendant no doubt had complex reasons for making his choice to participate in the conspiracy, the goal of the conspiracy was to inflate the values of certain bonds so as to hide losses that were being suffered by the group; such losses would have had some impact on the defendant's year-end remuneration and, in the Government's view, played some part in his motivation, consciously or not.

Finally, the fact that the defendant had litigation costs associated with the recovery of his bonus from the bank, is not a reasonable basis for an adjustment to the loss amount. Using the amount of bonus as a proxy for loss is a reasonable approach in a case like this, where the impact is hard to calculate and the available reference points such as the amount of the mis-statement (in excess of $100 million) do not fairly capture the degree of culpability. Here, the Government agrees with Probation that the

9

bonus amount is a fair proxy for culpability for purposes of the Guidelines calculation.

**IV.     The Defendant's Cooperation**

Siddiqui has proven to be a valuable cooperating witness. His cooperation was important to the Government's prosecution of his superior, Serageldin, and was helpful in enabling the Government to approach and ultimately secure the cooperation of Higgs.

First, the defendant made the decision to cooperate before any charges were filed. This decision was important to the Government's ability to progress the investigation and ultimately bring charges in this case. Although there was significant evidence against Serageldin separate and apart from any cooperator testimony, including phone calls recorded in the ordinary course of business by CS, the subject-matter of the case was very complex; and proving criminal intent on Serageldin's part was a challenge faced by the prosecution. Siddiqui's decision to cooperate provided the Government with a witness who could translate the complex subject-matter being discussed on the recorded phone calls in a manner that could be understood by those not versed in the arcana of making fair value determinations of complex securities, and who was able to speak, from first-hand experience, to the intent of Serageldin and the other conspirators.

Further, from the time Siddiqui began proffering with the Government, he has been truthful, forthcoming and reliable, both with

respect to his own conduct and that of others.  He has taken responsibility for his own role in the conspiracy and consistently described the roles of others accurately. He met many times with representatives of the SEC, the FBI and this Office, during the investigation, describing key meetings and his interactions with other co-conspirators.  After charges were brought, Siddiqui was prepared to testify, if needed.  Ultimately, no testimony necessary, as Higgs pled guilty the same day as Siddiqui, and ultimately Serageldin elected to plead guilty.

   Finally, the case against Serageldin and his co-conspirators was an important one, one of the few prosecutions arising out of the financial crisis.  The conduct at issue was serious.  It was important that the Government demonstrate its willingness and ability to prosecute cases of wrongdoing, even where the means employed and securities involved were complex.  Here, Siddiqui's cooperation was important because such complexity could give rise to after-the-fact claims that what in reality was deliberate mis-marking, merely was due to accident or mistake. Siddiqui's cooperation was, therefore, in the Government's view, very important.

**V.  Conclusion**

   For the foregoing reasons, the Government believes that Salmaan Siddiqui has provided substantial assistance in the investigation and prosecution of others.  The Government therefore

11

requests that the Court sentence Siddiqui in light of the relevant facts stated above and the factors set forth in Section 5K1.1(a)(1)-(5) of the Sentencing Guidelines.  The Government also attaches a proposed forfeiture order for Your Honor's consideration, in the amount of after-tax bonus the defendant received.

Dated:    New York, New York
          July 28, 2014

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney


                        By:_____/s/_____
                           Eugene Ingoglia
                           Assistant United States Attorney
                           212-637-1113