E7U5sidS1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4          v.                  12 Cr. 89 (PAC)

5   SALMAAN SIDDIQUI,

6            Defendant.

7   ------------------------------x

8                            New York, N.Y.
                                July 30, 2014
9                             4:45 p.m.

10

11   Before:

12                 HON. PAUL A. CROTTY,

13                             District Judge

14                    APPEARANCES

15   PREET BHARARA
       United States Attorney for the
16        Southern District of New York
  EUGENE E. INGOGLIA
17        Assistant United States Attorney

18   IRA LEE SORKIN
  NICOLE PAPPAS DE BELLO
19        Attorneys for Defendant

20

21

22

23

24

25

1          (Case called)

2          THE DEPUTY CLERK:  Counsel for the government, please

3   state your appearance.

4          MR. INGOGLIA:  Good afternoon, Judge.  Gene Ingoglia

5   for the United States.

6          THE COURT:  Hello, Mr. Ingoglia.

7          THE DEPUTY CLERK:  For the defendant?

8          MR. SORKIN:  Yes, your Honor; for the defendant, Ira

9   Lee Sorkin and my colleagues Nicole DeBello and Ally Droz from

10  the firm Lowenstein Sandler, and between her and myself is the

11  defendant Salmaan Siddiqui.

12         THE COURT:  Mr. Siddiqui, how are you?

13         THE DEFENDANT:  Good, thank you.

14         THE COURT:  Has everybody seen the presentence report

15  dated July 23rd, 2014?

16         MR. SORKIN:  Yes, your Honor.

17         THE COURT:  Any statements you want to make or

18  corrections?

19         MR. SORKIN:  No, your Honor.  The corrections are in

20  the back.

21         THE COURT:  They are.  The corrections you wanted made

22  were made?

23         MR. SORKIN:  Yes.

24         THE COURT:  I'm going to accept the facts as set forth

25  in the presentence report as accurate.

1          The guidelines are calculated at offense level 150 and

2     Criminal History Category of I, resulting in a guideline

3     sentence of 18 to 24 months.

4          Do you agree that those are accurate?

5          MR. SORKIN:  Yes, your Honor.

6          THE COURT:  Now, Mr. Sorkin, I have read your

7     submission.  It is voluminous but I know you want to elaborate

8     on it.

9          MS. DE BELLO:  Your Honor, if I may, in our sentencing

10    submission we did object or disagree with the loss or gain

11    calculation, so in terms of the statement that we agree with at

12    sentencing --

13         THE COURT:  We don't have to get into this fight.

14         MS. DE BELLO:  Sure.

15         THE COURT:  I don't agree with the loss calculations

16    either, Ms. DeBello but the fact of the matter is they are the

17    loss calculations which are made pursuant to the Guidelines.

18    That's all we have to established under 3553(a), that those are

19    the Guidelines that are applicable.  What we do thereafter is

20    another story all together.

21         MS. DE BELLO:  Understood, your Honor.

22         THE COURT:  So I don't want to have a big fight with

23    whether Judge Hellerstein was right or wrong.

24         MS. DE BELLO:  Understood, your Honor.

25         THE COURT:  I think he was right but it doesn't make

1    any difference.

2              All right, Mr. Sorkin.

3              MR. SORKIN:  May I proceed, your Honor?

4              THE COURT:  Yes.

5              MR. SORKIN:  Your Honor, may I do it from the podium?

6              THE COURT:  Sure.

7              MR. SORKIN:  Thank you.

8              Thank you, your Honor.  The sentencing memorandum, as

9    your Honor well knows submitted by counsel on behalf of

10   Mr. Siddiqui is, we think, quite extensive.

11             THE COURT:  Yes.

12             MR. SORKIN:  Well over 60 pages with many letters, and

13   I think we have stated everything we need to say but I want to

14   emphasize certain points at this time.

15             Mr. Siddiqui appears here today as a 39-year-old man,

16   married, two young children, and the first person from his

17   family, a citizen of the United States.  Of over 30 Pakistani

18   relatives that came to the United States, Mr. Siddiqui became

19   the first to become a United States citizen.

20             He never knew his father.  His father was in the

21   Pakistani Air Force, his father was killed before he was born

22   when his mother was pregnant with him.  At the time of the

23   father's death his mother was 22 years old, had a one and a

24   half-year-old child, was uneducated, lived in Pakistan, and

25   through events which I do not understand but perhaps the

1    culture is the deceased father's family wanted to take custody

2    of his then one and a half-year-old brother -- he was not born

3    yet -- and his mother who as I said was uneducated, feared that

4    she would lose not only her child of one and a half but on the

5    birth of Mr. Siddiqui perhaps Mr. Siddiqui as well to his

6    deceased father's family and she fled to the United States.

7         When she came to the United States, your Honor, she

8    moved in with her four brothers who I believe were living in

9    Atlanta, Georgia at the time.  She then moved to Sacramento,

10   California, where Mr. Siddiqui was raised and she lived with

11   Mr. Siddiqui's four uncles and the grandparents.  His

12   discipline came from his mother and his four uncles.

13        At the time, and as he was growing up, things were

14   very difficult and I think that's an understatement.  There

15   were seven to nine people living in a one bedroom apartment in

16   Sacramento.  By the time Mr. Siddiqui went off to college --

17   and I will get to that in a moment -- there were approximately

18   19 members of his extended family living in a four-bedroom

19   house.

20        His mother, to her credit, a remarkable woman, knew

21   that she was not educated and she needed to get educated to

22   support the family.  She obtained a GED and then a degree in

23   civil engineering.  That did not make life much simpler at all

24   for Mr. Siddiqui and his brother because when Mrs. Siddiqui --

25   his mother -- had to study, she would take her two children to

1   the library and leave them there while she studied.  When she

2   got a paying job she would bring them to work.

3          Mr. Siddiqui, when he was in school, we all like to

4   think our children have extracurricular activities and the many

5   things they do, that was not the case for Salmaan Siddiqui.

6   Salmaan Siddiqui began working at the age of 12, he had jobs

7   such as a paper route, construction, a janitor, all in an

8   effort to support his mother and his brother.  The clothes that

9   he wore, whenever his mother found time, were sewn together by

10  his mother.  And as I mentioned earlier, your Honor, just a

11  moment ago, the menial jobs that Mr. Siddiqui was engaged in

12  assisted not only his mother and his brother but his extended

13  family.

14         Through it all, your Honor with the jobs, the living

15  conditions, Mr. Siddiqui was able to obtain acceptance to

16  Dartmouth College and he attended Dartmouth College and he

17  graduated Dartmouth College.  And while at Dartmouth, your

18  Honor, as you can see from many of the letters, he became a

19  mentor and a friend not only to other Pakistanis attending

20  Dartmouth but also many other students at Dartmouth.

21         Everything in his background, your Honor; his

22  upbringing, his work ethic, his remarkable mother and extended

23  family and his success in life must be judged against the

24  conduct that he engaged in toward the end of December 2007 when

25  he lost -- and he will be the first to admit this -- his moral

and ethical compass.  To this day, your Honor, as we say in our

sentencing memorandum, the only explanation for that is his

non-confrontational nature and his desire to obey authority.

He followed the directions, to his everlasting regret, of his

superior and his superior's superior and, with great sadness

here, the violative conduct that he engaged in wasn't even his

regular job when Faisal Siddiqui -- no relation to

Mr. Siddiqui -- went on vacation.

THE COURT:  He was called in to serve.

MR. SORKIN:  He was called in to mark to the market.

His job was as a trader, he had no knowledge about marking to

the market, marking very complex derivatives that were in

Credit Suisse's book but he was smart, he was a quick learner,

and he did his best and in that very short period of time there

came a point where he was told by his superior and his

superior's superior Mr. Higgs and Mr. Serageldin that the marks

had to be marked a certain way in order to increase the P&L --

the profit and loss.

I sometimes wonder myself how fate plays a role in the

cases that come before this Court.  But for Faisal Siddiqui had

decided not to go on vacation, we wouldn't be here today.

Let me just turn quickly, your Honor, because the

letters are in there, to his prior employment remarkably and

clearly for obvious reasons, we don't have any letters from his

superiors at Credit Suisse but we do have letters from firms

1    that he worked at from individuals for whom he worked and those

2    letters, your Honor, are remarkable in laying out his work

3    ethic, his integrity, his decency, his honesty.  And I think

4    rarely does this Court in the Southern District get letters

5    from prior employers who are willing to step up to the plate

6    notwithstanding the fact that one of their former employees

7    engages in violative conduct and write such wonderful letters.

8            The letters, your Honor, of which there are many

9    written on his behalf, all speak to his kindness, his

10   generosity; they come from his friends, his college classmates,

11   his extended family and in particular, your Honor, I want to

12   emphasize from two senior representatives from the offenders'

13   aid and rehabilitation organization which he volunteered to

14   work at some time ago after he ran into trouble.  That's an

15   agency, your Honor, as the papers made clear, that assists and

16   counsels formerly incarcerated individuals to bring them back

17   into society.  And two letters that he received from the senior

18   people -- Kathy Steinberg, who is the director of the program

19   and Gail Arnell, the executive director -- those letters are

20   effusive stating the work that he has done.

21           The last point I wanted to raise, your Honor, to

22   emphasize even though it is well documented in our papers, is

23   his extraordinary cooperation.

24           I pass over the letters from Assistant United States

25   Attorney Ingoglia and the senior representative from the SEC

1  Michael Osnato.  They were in charge of the investigation.

2  Ms. DeBello and I attended the proffer sessions; he did so

3  voluntarily and he did so, your Honor, before he ever knew that

4  anyone else was cooperating in the case.  We found out --

5              THE COURT:  He started cooperating when, Mr. Sorkin?

6              MR. SORKIN:  Just right from the beginning, your

7  Honor, when we were first contacted.

8              THE COURT:  The beginning is?

9              MR. SORKIN:  2010, I believe.

10             THE COURT:  2010.

11             MR. SORKIN:  2010.

12             THE COURT:  He wasn't indicted or an information

13  wasn't filed until 2012?

14             MR. SORKIN:  That's correct, your Honor.

15             THE COURT:  So, for two years prior and two years

16  subsequent, four years.

17             MR. SORKIN:  And, again, forgive me for being

18  redundant, he did so without the knowledge that Mr. Higgs had

19  decided to cooperate.  There was no suggestion that others were

20  cooperating and he had to fall into line.  He voluntarily went

21  down, appeared before the SEC, representatives of the U.S.

22  Attorney's office, FBI agents, and he did so on repeated

23  occasions.  All told, your Honor, he put in about 75 hours of

24  cooperation with the authorities.

25             I think also, and this I find to be extraordinary, I

1  have never seen it before and I have been doing this for a few

2  years, Michael Osnato who is now the chief of the Complex

3  Securities Derivatives Unit I think --

4        MS. DE BELLO:  Financial instruments.

5        MR. SORKIN:  Financial instruments, thank you,

6  Ms. DeBello -- contacted Ms. DeBello and --

7        THE COURT:  He made a guest appearance.

8        MR. SORKIN:  He did more than a guest appearance, your

9  Honor; he articulated and spoke to about 175 staff members of

10  the SEC in Washington at headquarters with a hookup to New York

11  explaining and responding to all questions as to what he had

12  done, why he did it, the cooperation process, why he decided to

13  cooperate.  I know of no instances, your Honor, where that's

14  ever been done unless, of course, you have got a serious

15  cooperator who has got a formal cooperation agreement, has been

16  indicted, has pled to any number of cases and is now going into

17  the witness protection program.  That's generally where you see

18  that type of cooperation.

19        The collateral consequences, your Honor, of what he

20  did:  He has lost his job.  He has lost his career.  He's in

21  all likelihood -- I never want to say never because the statute

22  does permit at some point in time a reapplication, but it is

23  not likely that he will ever be able to come back and associate

24  with a registered entity in this industry.

25        Secondly, he has inflicted a great deal of shame and

 1   hurt on his close-knit family putting aside what he has felt.

 2   He has lost his income and he has lost his ability at this

 3   point in time to support his family.

 4        We respectfully ask this Court to weigh all of these

 5   factors that we have set forth here briefly and in our rather

 6   extensive sentencing memorandum to sentence Mr. Siddiqui to the

 7   recommendation put forth by the probation department in the

 8   presentence report.

 9        Thank you, your Honor.

10        THE COURT:  Let me ask you about that, Mr. Sorkin.

11        MR. SORKIN:  Yes, your Honor.

12        THE COURT:  The presentence report filed by the

13   Department of Probation does not recommend custody, does not

14   recommend supervised release; it recommends probation for one

15   year and a fine of $20,000.

16        Do you agree with that?

17        MR. SORKIN:  Yes, your Honor.

18        THE COURT:  What about Mr. Ingoglia's preliminary

19   order of forfeiture money judgment?

20        MR. SORKIN:  Your Honor, with all due respect, I would

21   like Ms. DeBello to address that.  She has immersed herself in

22   that issue and I would like the Court to respectfully hear her.

23        THE COURT:  Are you finished?  I didn't mean to cut

24   you off.

25        MR. SORKIN:  No, no.  I had finished, your Honor.

1    Thank you.  Thank you for your time.

2              THE COURT:  Ms. DeBello?

3              MS. DE BELLO:  Yes; and I will go to the podium as

4    well, your Honor.  If you will give me just one second?

5              Your Honor, with all due respect to my colleague, I

6    did want to clarify and as you saw in our submission that we

7    did ask for time-served and not the one year of probation, and

8    while we appreciate probation's recommendation --

9              THE COURT:  Well, following time-served did you

10   recommend supervised release for a period of time?

11             MS. DE BELLO:  I'm sorry.  Excuse me, your Honor?

12             THE COURT:  If I sentence him to time-served do you

13   expect a period of supervised release after the time-served?

14             MS. DE BELLO:  No, your Honor.  I think that's what we

15   were --

16             THE COURT:  You want just time-served?

17             MS. DE BELLO:  Time-served, your Honor; yes.  And

18   that, your Honor, we do appreciate the nature of the

19   probation's recommendation for the one year but it is really

20   the time-served request is based on --

21             THE COURT:  You were going to tell me about

22   forfeiture.

23             MS. DE BELLO:  Yes.

24             THE COURT:  Go ahead.

25             MS. DE BELLO:  Sure.

1          So, your Honor, the government has recommended

2     $570,000 which is the post-tax amount of Mr. Siddiqui's bonus

3     from 2007 that he received from Credit Suisse.  There are a few

4     nuances to that number which we set forth in our papers but to

5     begin with, the forfeiture statutes require that forfeiture

6     constitutes or is derived from the proceeds traceable to the

7     commission of the offense and the statute also provides that

8     proceeds is defined as any -- property of any kind obtained

9     directly or indirectly as the result of the commission of the

10     offense giving rise to the forfeiture.  A number of the cases

11     in the Southern District implement this but-for analysis and we

12     have no evidence and there is no evidence in the record that we

13     are aware of, that had Mr. Siddiqui not engaged in this conduct

14     he would not have received the same exact bonus that he

15     received.

16          We have mentioned in our papers that he had been told

17     he was getting a promotion to managing director.  That decision

18     was made in mid-2007 well before the conduct took place.  And

19     so, Mr. Siddiqui's understanding is that his bonus was

20     discretionary and based on his, the totality of his work and

21     the conduct for which he is here for is obviously significant

22     but the role it played in his work for Credit Suisse and the

23     work for his group was a small, small, small fraction.  I mean,

24     it was a matter of days where this conduct occurred whereas his

25     day job was that of a trader where he was judged to be

E7U5sidS1                    sentence

1    excellent at that role and that's why he was going to get the

2    promotion.

3              And so, we are just struggling with this but-for

4    analysis and you don't agree that the bonus was caused by his

5    conduct.

6              THE COURT:  Okay.  Do you have an amount in mind or do

7    you just say no forfeiture?

8              MS. DE BELLO:  Well, we have suggested in our papers,

9    your Honor, because Mr. Siddiqui does take responsibility for

10   his action and we have proposed, while it is not an exact

11   science a prorated amount.  So if, for example, after tax he

12   received 570 in totality, we broke that down per month.  His

13   marking the book took place over a period of approximately four

14   weeks.  While we contend that his conduct at issue here took

15   place over the matter of a day or two but without getting into

16   specifics, we have broken down a proposed forfeiture number to

17   one month of his bonus which is approximately $47,000.

18             So, that is our proposal, your Honor.

19             THE COURT:  Mr. Ingoglia?

20             MR. INGOGLIA:  On forfeiture?

21             THE COURT:  Well, on forfeiture but do the 5K1 first,

22   please.

23             MR. INGOGLIA:  Sure.

24             THE COURT:  Then you can do forfeiture.

25             MR. INGOGLIA:  Thank you, Judge.

1          First, the defendant did provide substantial

2     assistance in our investigation and prosecution of others so we

3     do move under Section --

4          THE COURT:  He started right away.  There was never

5     any doubt about the level of his cooperation, its completeness,

6     intensity.

7          MR. INGOGLIA:  Very early, very complete.

8          THE COURT:  He was truthful, he was honest, he was

9     complete in his disclosures.

10          MR. INGOGLIA:  That's correct on all counts so we

11     think it was important, we think it was early.  That was an

12     aspect of importance, the relative complexity of the securities

13     at issue and the marking process.  He was very important in

14     helping us with that and he was truthful and truthful in our

15     dealings with us, with the SEC.  I think that that is important

16     both as a cooperator and as an indication that you have seen in

17     other things that he has done that, he has true remorse for

18     what he has done.  It takes real responsibility and he is not

19     just saying that.  I think his volunteer work speaks to that as

20     well.

21          So, for all of those reasons we think his cooperation

22     was important and that's why we make the motion we do.  It was

23     an important case for us and it would have been difficult for

24     us to bring without his cooperation.

25          (Continued on next page)

1          THE COURT:  Let me ask you a question about supervised

2     release and/or probation.  Since he has been cooperating and

3     has been living closely with agents and with the SEC and the

4     FBI for the past four years, is there any utility in terms of

5     supervised release or probation?

6          MR. INGOGLIA:  I don't think it's important which way

7     it's structured, and I don't think there is a strong need for a

8     supervised release term.  Mr. Higgs did not receive supervised

9     release.  In part, that was a recognition of the fact that he

10    is not a citizen of the United States and that it would be

11    practically difficult, but I don't see a crying out need for

12    supervision here.

13         THE COURT:  Now, what about the forfeiture amount?

14         MR. INGOGLIA:  As an initial matter, the bonus is tied

15    to his overall performance.  His performance was for the fiscal

16    year 2007.  That's the year that the misconduct takes place and

17    the bonus is paid for that year.  So there is a connection to

18    the offense.

19         THE COURT:  But he was doing other things too, right?

20         MR. INGOGLIA:  For sure.  The question is just, do we

21    as a general matter and is there precedent for divvying up a

22    percentage of the person's time that he spends on the fraud as

23    compared to the amount of time he spends on other things?  I

24    haven't seen an example of that in the case law.  To give an

25    example, we don't deduct three quarters of a Ponzi schemer's

E7U8SIDS2

1  profits from rewarding forfeiture because he was asleep for a

2  quarter of the day.

3       THE COURT:  A Ponzi scheme is different because there

4  is no value from the Ponzi scheme other than what the fraudster

5  brings in through his fraudulent scheme.  That isn't true of

6  Mr. Siddiqui.

7       MR. INGOGLIA:  As I say, there is no support for a pro

8  rata case law support.  There is no case law that says my

9  analysis controls either.  But it makes intuitive sense that

10 the bank was not going to pay a bonus to someone who is

11 deliberately mismarking its books and contributing to it having

12 to file a restatement.

13      THE COURT:  Therefore, you capture it all?

14      MR. INGOGLIA:  That's our argument.

15      As to one other aspect of this.  If one is

16 contemplating trying to do some sort of apportioning of the

17 number, the conspiracy period is roughly a third of the year.

18 It runs from August through December.  That, to me, considering

19 there was misconduct in August, there was misconduct in

20 October, and there was misconduct in December, seems a more

21 reasonable apportionment, if one is going to go that route,

22 than just adding up the number of days.  So if one was to do

23 that, a third of the 570 would be, roughly, 190.  That's not

24 what we are seeking, but if we are going down that road, that

25 might be a different way to do it.

1          THE COURT:  Thank you very much.

2          Mr. Siddiqui, this is your opportunity to speak.

3          THE DEFENDANT:  Your Honor, thank you for the

4  opportunity to speak.

5          It's with deep regret and shame that I take full

6  responsibility for my actions.  I am truly sorry for the pain

7  and suffering I have caused my wife, my family and friends.

8          Throughout my career in the financial services

9  industry, I prided myself on acting ethically, professionally

10  and responsibly.  I sincerely enjoyed the intellectual

11  challenge of my job, and, of course, also appreciated the

12  opportunity to support my family.  However, for the end of 2007

13  I allowed myself to engage in conduct which violated the law.

14          As reflected in my letter and the submission by my

15  counsel, when I realized I was being given directives by my

16  superiors to mark certain bonds, according to my superiors'

17  profit and loss goals and not according to fair market value, I

18  should have refused.  I should have reported them to

19  compliance.  If that did not work, I should have gone to the

20  authorities.  Instead, I said OK, and went ahead with the

21  instructions that I was given.  I was faced with a task, and I

22  failed.  I wish I had the courage to stand my ground and say

23  no.  Instead, I internally justified my actions and took the

24  easy way out, and for that there is no excuse.

25          Since my plea before you, your Honor, in February

1  2012, I focused on creating something very productive out of my

2  situation.  I spent time with my family and friends, especially

3  the younger generation of my family, imploring them to learn

4  from my mistakes as well.  I sat for hours explaining to the

5  younger generation how I got myself into this situation and how

6  they must never allow themselves to compromise their ethics.  I

7  have also spent a large part of my time since February 2012

8  with an organization called Offender Aid and Restoration,

9  working to help formerly incarcerated individuals transition to

10  a productive life outside of prison.  While my contributions to

11  OAR cannot make up for my wrongful conduct, it's been the best

12  way I have known how to make amends for my conduct and

13  contribute to society itself.  It has also served as a function

14  for me to feel productive, and for that I have gotten a great

15  deal of satisfaction out of it as well.  I plan to continue my

16  work in OAR and be a contributor to their effort.

17      Your Honor, I know it's only one factor of your

18  analysis, but I assure you I will never allow my ethics or

19  judgment to ever be compromised again.  I will never cross or

20  come close to any line of impropriety.  I am grateful for the

21  many letters of support I have received from my family, friends

22  and former colleagues.  I hope that those letters have provided

23  your Honor with some level of insight as to who I am as a

24  person.

25      Separate and apart from my conduct at issue in this

1   case, I respectfully ask your Honor to take all aspects of my

2   life into consideration when you decide my sentence.

3          Thank you for the opportunity to be heard.

4          THE COURT:  Mr. Siddiqui, the work that you're doing,

5   does it pay you a salary?

6          THE DEFENDANT:  No, it does not.

7          THE COURT:  What are you living on?

8          THE DEFENDANT:  My savings, your Honor.

9          THE COURT:  OK.  Anything else you want to say?

10         THE DEFENDANT:  No.  That is all, your Honor.

11         THE COURT:  Thank you very much, Mr. Siddiqui.

12         Anybody else want to speak?

13         Mr. Sorkin?

14         MR. SORKIN:  No.  Thank you, your Honor.

15         THE COURT:  All right.  Well, I have gone back and

16  read the plea agreement of January 23, 2012, and the colloquy

17  that we had at the time.  That plea agreement calls for the

18  defendant admitting the forfeiture allegations in the

19  information, in which he agrees that a sum of money

20  representing the approximate amount of proceeds traceable to

21  the commission of the offense will be forfeited.

22         I have read carefully Mr. Sorkin's and Ms. De Bello's

23  lengthy summary, which is very revealing about Mr. Siddiqui and

24  his family life, and how he came to be so successful and

25  overcoming major hurdles to success, but he did it and achieved

1    a record of commendable record, but an important respect is he

2    now admits he failed.

3         When he was brought to light, he cooperated right

4    away.  He didn't know what the outcome was going to be.  His

5    cooperation, in the words of the government, right from the

6    very start, starting at page 10 of their submission, he is a

7    valuable cooperating witness; he is helpful.  The government

8    points out that Mr. Siddiqui made his decision to cooperate

9    before any charges were filed, and his record was a full,

10   complete and very helpful cooperation, which resulted in the

11   conviction of Mr. Serageldin and a time served sentence imposed

12   for Mr. Higgs.

13        So I take all of that into consideration.  I have

14   considered the factors of 3553(a), and I have read the text of

15   5K1.

16        I am going to impose a sentence of time served.  There

17   will be no supervised release.  The government's attorney

18   points out, Mr. Ingoglia, that after four years of living in

19   close proximity to SEC agents and FBI agents, there is no real

20   need for any period of supervision.  I am not going to impose a

21   fine.

22        I am going to, in light of the plea agreement, order a

23   forfeiture money judgment of $150,000.  I will sign the

24   proposed order of forfeiture money judgment, and it will be

25   made part of the record here in this sentence.

E7U8SIDS2

1         I must impose a special assessment of $100.

2         So, Mr. Sorkin, I will give you an opportunity to

3    object before I impose sentence.  The sentence is time served

4    with no supervised release and no fine, forfeiture in the

5    amount of $150,000, with a special assessment of $100.  Any

6    objections other than the ones you have already voiced?

7         MR. SORKIN:  No objection.

8         THE COURT:  The sentence is imposed.

9         Mr. Siddiqui, now that I have imposed sentence, I have

10   to advise you under Rule 32 of the Federal Rules of Civil

11   Procedure that you have the right to appeal the sentence.  If

12   you can't afford to pay appeal costs, you have the right to ask

13   for permission to appeal in forma pauperis.  My clerk will

14   immediately prepare and file a notice of appeal on your behalf

15   if you so request.  The notice of appeal has to be filed within

16   14 days of the entry of judgment.  Judgment will be entered by

17   noontime tomorrow.  You have 14 days in which to file your

18   notice of appeal.  Mr. Sorkin I am sure can advise you on that

19   further.

20        MR. SORKIN:  Yes, your Honor.

21        The other point is for the $100 assessment, I think

22   the clerk's office is closed now.  May we pay that tomorrow?

23        THE COURT:  Yes.

24        MR. SORKIN:  Thank you.

25        THE COURT:  You can pay it any time this week.

E7U8SIDS2

1          Anything else?

2          Any open charges?

3          MR. INGOGLIA:  There are not.

4          THE COURT:  Thank you very much.

5          Mr. Ingoglia, I didn't say this, but I don't think I

6     have to say this.  I am granting your 5K1 motion.

7          MR. INGOGLIA:  Understood, Judge.

8          THE COURT:  If I have to say it, I have said it.

9          MR. SORKIN:  I would like to add, your Honor, that the

10    sentencing memorandum was exclusively the work of Ms. De Bello.

11         THE COURT:  Congratulations, Ms. De Bello.

12                              oOo

13

14

15

16

17

18

19

20

21

22

23

24

25